STATE OF CONNECTICUT *v.* HOSSAN-MAXWELL, INC.,
ET AL.

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

---

Argued May 7—decision released August 5, 1980

*Richard Hanna,* for the appellant (named defendant).

*Steven M. Rutstein,* assistant attorney general, with whom were *Robert M. Langer,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellee (plaintiff).

COTTER, C. J., The issue presented in this appeal concerns the applicability of the Connecticut Anti-Trust Act; General Statutes §§ 35-24 through 35-45; to restrictive covenants included in the sale of sixty-

four subdivision housing lots. The state brought suit alleging that the restrictive covenants at issue were in restraint of trade in violation of General Statutes §§ 35-26, 35-28 (d) and 35-29 because they illegally tied real estate brokerage services to the sale, resale or lease of the subdivision lots. In the first count of the complaint, the state alleged that the exclusive sales and leasing rights conferred by the covenant constituted a combination or conspiracy to boycott all other licensed real estate brokers in violation of General Statutes §§ 35-26 and 35-28 (d). In a second count the state alleged that the defendants' arrangement was an attempt to monopolize the market for real estate brokerage services in violation of General Statutes § 35-27. The trial court granted the state's motion for summary judgment as to the first count against the defendants James F. Hartnett, Bren Construction Co., Inc., Jansen Realty, Inc. and Hossan-Maxwell, Inc. It is from that judgment in favor of the plaintiff on the first count that only the defendant Hossan-Maxwell, Inc., appeals.

The material facts are not in dispute.[1] On July 15, 1966, James F. Hartnett recorded a "Declaration of Covenants and Restrictions" upon certain parcels of land in New Milford known as Dean

---

[1] Although the defendant contends that genuine factual issues do exist, aside from the bald assertion that the summary judgment standard is not met, the defendant fails to specify any such controversy, nor do we find any to be revealed by the pleadings or affidavits of the parties.

In evaluating the propriety of a summary judgment, we are confined to an examination of the pleadings and affidavits of the parties to determine whether (1) there is no genuine issue as to any material fact, and (2) the moving party is entitled to judgment as a matter of law. Practice Book, 1978, § 384. As we do not find any issue of material fact to be in dispute, the sole issue is whether the summary judgment is correct as a matter of law.

Heights. Paragraphs 19 and 20 of that declaration require a grantee of any of the sixty-four lots who decides to sell or lease the property through any person to whom a commission would be payable to give exclusive sales and leasing rights to Hartnett for a period of three months.[2] By the express terms of the declaration of covenants, the exclusive rights were intended to run with the land and to bind the immediate grantee and all subsequent purchasers.[3]

On May 14, 1973, Hartnett conveyed all right, title and interest in the declaration of covenants to Bren Construction Co., Inc. Seven days later, Bren assigned certain of its rights to Jansen Realty, Inc. On November 4, 1974, Jansen and Bren jointly

[2] Paragraphs 19 and 20 of the "Declaration of Covenants and Restrictions" read as follows:

"19. If the Grantee decides to sell said above described premises through any other person, agent or real estate broker to whom a commission would be payable, he hereby gives exclusive sales right to James F. Hartnett, or such person, agent or broker as he may designate, said listing to be at the lowest price the Grantee is willing to accept, and for a period of three (3) months. When decision to sell is made Grantee hereby agrees to list in writing the lowest price he is willing to accept.

"20. If the Grantee decides to lease through any other person, agent or real estate broker to whom a commission would be payable, he hereby gives exclusive leasing right to the Grantor, or such other person, agent or broker as he may designate, the said listing to be at the lowest price the Grantee is willing to accept and for a period of three (3) months. In the event of such lease the amount of said commission shall not exceed 10%. When decision to lease is made Grantee hereby agrees to list in writing the lowest price he is willing to accept."

[3] The validity of the restrictive covenants as to subsequent grantees was not raised in the pleadings, litigated or considered at trial and therefore we express no opinion as to this issue. Authorities discussing the question whether similar covenants run with the land or are personal indicate that the covenant here found invalid on antitrust grounds may be susceptible to attack premised upon traditional rules of property law. See Restatement, 5 Property § 537; *Pulver* v. *Mascolo*, 155 Conn. 644, 237 A.2d 97; *Patrone* v. *Falcone*, 345 Mass. 659, 189 N.E.2d 228.

assigned to Hossan-Maxwell, Inc., all their interest concerning the brokerage services. In February, 1976, Robert Hossan, the president of Hossan-Maxwell, Inc., informed a Dean Heights home-owner that her efforts to sell her home through a competing real estate broker violated Hossan-Maxwell's exclusive brokerage rights and that Hossan-Maxwell would take steps to prevent sales through any other broker.

## I

A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (tied) product, or at least agree that he will not purchase that product from any other supplier. *Northern Pacific Ry. Co.* v. *United States,* 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545. Since it is undisputed that a tying arrangement exists, we first consider the defendant's claim that the Connecticut act does not apply to arrangements involving services. General Statutes § 35-29 provides that "[e]very lease, sale or contract for the *furnishing of services* or for the sale of commodities, or for the fixing of prices charged therefor, or for the giving or selling of a discount or rebate therefrom, on the condition or understanding that the lessee or purchaser shall not deal in the services or the commodities of a competitor or competitors of the lessor or seller, shall be unlawful where the effect of such lease or sale or contract for sale or such condition or understanding may be to substantially lessen competition or tend to create a monopoly in any part of trade or commerce and where such goods or services are for the use, consumption or resale in this state." Thus,

in light of the clear wording of General Statutes § 35-29, the defendant's claim that the Connecticut act does not apply to services is without merit.[4]

## II

Our construction of the Connecticut Anti-Trust Act is aided by reference to judicial opinions interpreting the federal antitrust statutes. *Elida, Inc.* v. *Harmor Realty Corporation,* 177 Conn. 218, 226–27, 413 A.2d 1226; *Mazzola* v. *Southern New England Telephone Co.,* 169 Conn. 344, 348, 363 A.2d 170. Cf. *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 435 A.2d 353.

Tying arrangements are among the small group of practices which courts have found to be "unlawful in and of themselves." *Northern Pacific Ry. Co.* v. *United States,* supra, 5; *International Salt Co.* v. *United States,* 332 U.S. 392, 68 S. Ct. 12, 92 L. Ed. 20; *Elida, Inc.* v. *Harmor Realty Corporation,* supra, 227, 228. The justification for the per se approach is that "[t]ying agreements serve hardly any purpose beyond the suppression of competition." *Standard Oil Co.* v. *United States,* 337 U.S. 293, 305, 69 S. Ct. 1051, 93 L. Ed. 1371. Nonetheless, "[it is only] when certain prerequisites are met, [that] arrangements of this kind are illegal in and of themselves, and no specific showing of unreasonable competitive effect is required." *Fort-*

---

[4] The defendant also interposes a claim of immunity from the Connecticut Anti-Trust Act under the exception provided in General Statutes § 35-31b. This claim, while assigned as error, was not addressed in the defendant's brief or at oral argument and is therefore considered abandoned. *Gluck* v. *Gluck,* 181 Conn. 225, 435 A.2d 35; *Healy* v. *White,* 173 Conn. 438, 441, 378 A.2d 540; Maltbie, Conn. App. Proc. § 327. Nor does the defendant make any claim that the sale of interests in land does not fall within the statutory language of General Statutes § 35-29.

*ner Enterprises, Inc.* v. *United States Steel Corporation,* 394 U.S. 495, 498, 89 S. Ct. 1252, 22 L. Ed. 2d 495 (hereinafter *Fortner I*). The classic formulation of these prerequisites was expressed by Justice Black in *Northern Pacific Ry. Co.* v. *United States,* supra, 6. In that case, brought under § 1 of the Sherman Antitrust Act; 15 U.S.C. § 1; tying arrangements were deemed per se illegal, "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pacific Ry. Co.* v. *United States,* supra, 6.

Although both tests must be met to constitute a violation of § 1 of the Sherman act, under § 3 of the Clayton Antitrust Act; 15 U.S.C. § 14; a tie-in is per se illegal if either condition is met. *Times-Picayune Publishing Co.* v. *United States,* 345 U.S. 594, 608, 609, 73 S. Ct. 872, 97 L. Ed. 1277; *Moore* v. *Jas. H. Matthews & Co.,* 550 F.2d 1207, 1214 (9th Cir.); *Advance Business Systems & Supply Co.* v. *SCM Corporation,* 415 F.2d 55, 61–62 (4th Cir.), cert. denied, 397 U.S. 920, 90 S. Ct. 928, 25 L. Ed. 2d 101; *ILC Peripherals Leasing Corporation* v. *Internationl Business Machines Corporation,* 448 F. Sup. 228, 230 (N.D. Cal.). Since General Statutes § 35-29 is patterned after § 3 of the Clayton act;[5] 14 H. R. Proc., Pt. 9, 1971 Sess., p. 4182

---

[5] Comparison of § 3 of the Clayton Antitrust Act; 15 U.S.C. § 14; printed below, to General Statutes § 35-29 highlights the similarity of their provisions.

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the

(remarks of Rep. David H. Neiditz); Brodigan, "The Connecticut Antitrust Act," 47 Conn. B.J. 12, 15 (1973); and specifically includes the provision of services within its ambit, we believe that it is appropriate to adopt the Clayton act test in determining whether a violation of § 35-29 has occurred. Thus, the declaration of covenants and restrictions is unlawful per se if either condition under *Northern Pacific Ry. Co.* v. *United States,* supra 6, is met;[6] that is, if (1) the party has sufficient economic power in the tying product, or (2) a not insubstantial amount of commerce is affected. If the restraint violates both tests, the tying arrangement violates General Statutes § 35-26 as well as § 35-29.

## A

The tying of brokerage services to the sale of residential development of real estate is automati-

---

District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

[6] Under federal law, a complaint concerning a tying arrangement involving services can only be brought under the Sherman act and its two-pronged per se test because the federal Clayton act, unlike its Connecticut counterpart, is applicable only to commodities. *Robbins Flooring, Inc.* v. *Federal Floors, Inc.,* 445 F. Sup. 4, 10 (E.D. Penn.). The Clayton act test requires that only one of the two requirements be met. The justification for the lesser standard is that under § 3 of the Clayton act there need not be the actuality of an unreasonable restraint or monopoly which the Sherman act requires, but merely the probability that the activity complained of "may substantially lessen commerce or tend to create a monopoly." *Mytinger & Casselberry, Inc.* v. *F.T.C.,* 301 F.2d 534, 535 (D.C. Cir.); *Robbins Flooring, Inc.* v. *Federal Floors, Inc.,* supra, 10, 11.

cally illegal under § 35-29 whenever a substantial volume of commerce in the tied product is restrained. *Advance Business Systems & Supply Co.* v. *SCM Corporation,* supra. The amount of commerce affected is not measured by reference to the size of the tied product market. *Moore* v. *Jas. H. Matthews & Co.,* supra, 1216. ". . . [N]ormally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie, for as [the Supreme Court] held in *International Salt,* [supra, 396,] 'it is unreasonable, per se, to foreclose competitors from any substantial market through use of a tying arrangement.'" *Fortner I,* supra, 501.

In the case at hand, the dollar volume of business foreclosed to competitor real estate brokers is not insubstantial. Houses have been built on fifty-seven of the sixty-four building lots in the Dean Heights development. The defendant's affidavit states that an average of 10 to 15 percent of the homes will be sold each year if the development is typical of the real estate market in New Milford. The affidavit further states that the average commission on the sale of a home is 6 percent of the selling price. If we take the defendant at his word, an average of seven homes in the Dean Heights development will be sold each year at an average price (as of 1976) of $50,000. The total commerce involved each year is $350,000 and the annual volume of real estate commissions foreclosed is $21,000. The not insubstantial test has been met by showing dollar volumes which total $60,800; *United States* v. *Loew's, Inc.,* 371 U.S. 38, 49, 83 S. Ct. 97, 9 L. Ed. 2d 11; and

estimated sales of $86,377. *Detroit City Dairy* v. *Kowalski Sausage Co.,* 393 F. Sup. 453, 472 (E.D. Mich.). See also *Anderson Foreign Motors* v. *New England Toyota,* 475 F. Sup. 973, 987 (D. Mass.), describing the "very liberal interpretation" of the "not insubstantial" test by the United States Supreme Court. Even without delving into the nuances of present value and future discount rates, $21,000 per year into perpetuity clearly represents a "not insubstantial" sum.

## B

The United States Supreme Court has made it clear that the sufficient economic power standard does not require that the defendant have a monopoly or even a dominant position in the market for the tying product. *United States Steel Corporation* v. *Fortner Enterprises, Inc.,* 429 U.S. 610, 620, 97 S. Ct. 861, 51 L. Ed. 2d 80 (hereinafter *Fortner II*) ; *Fortner I,* supra, 502–503. Market power in the tying product may also be shown by product uniqueness or desirability. *United States* v. *Loew's, Inc.,* supra, 45; *Moore* v. *Jas. H. Matthews & Co.,* supra. The *Fortner II* opinion emphasizes that the proper focus of concern is whether the seller has the power to raise prices, or to require other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product. *Fortner II,* supra. The policy underlying antitrust law's prohibition of tying arrangements is that competing sellers as well

as consumers should be protected from unfair competition.[7] Turner, "The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv. L. Rev. 50, 60–61 (1958).

In the present case, the defendant has imposed a tying arrangement upon sixty-four pieces of residential property. The situation is analogous to that in *Northern Pacific Ry. Co.* v. *United States,* supra, where the tying product was a unique item, choice land. The Supreme Court found sufficient economic power on the basis of the land's uniqueness and strategic location. *Northern Pacific Ry. Co.* v. *United States,* supra; accord, *Bogosian* v. *Gulf Oil Corp.,* 561 F.2d 434, 453–54 (3d Cir.), cert. denied, 434 U.S. 1086, 98 S. Ct. 1280, 55 L. Ed. 2d 791. In Connecticut, the uniqueness and special characteristics of a particular plot of land have long been recognized. *Anderson* v. *Yaworski,* 120 Conn. 390, 395, 399, 181 A. 205. While the quantity of land involved in the present case does not approach the volume of land holdings owned by the Northern Pacific Railway, the uniqueness of residential property is nevertheless sufficient evidence of the market power possessed by the defendant.

---

[7] The defendant's argument that the limited duration of the exclusive sales and leasing rights (three months) as well as the competitive commission rate (6 percent) saves the tying agreement is unsupported by the case law. A tying agreement is not valid even if the price charged and the terms offered are the same as those offered by competitors. The United States Supreme Court has condemned agreements even where the tie was removed if a competitor offered a better price. *International Salt Co.* v. *United States,* 332 U.S. 392, 397, 68 S. Ct. 12, 92 L. Ed. 20. A tying arrangement which forces competitors to undercut the market while the tie holder merely meets competition is impermissible. *Northern Pacific Ry. Co.* v. *United States,* 356 U.S. 1, 12, 78 S. Ct. 514, 2 L. Ed. 2d 545.

## III

When the plaintiff has demonstrated either sufficient economic power to appreciably restrain free competition or that a not insubstantial amount of commerce is involved, the standards required for per se treatment of the tying agreement have been met. When the per se standards have been met, summary judgment may be appropriate. 2 Areeda & Turner, Antitrust Law ¶ 316d, pp. 68–69 (1978). Here, the pleadings and affidavits of the parties clearly established (1) the foreclosure of a not insubstantial volume of commerce in the tied product, and (2) defendant's market power over the tying product due to the uniqueness of the land. *Fortner I,* supra, 499. In tying cases, the Supreme Court has approved summary judgments issued against the defendants. *Northern Pacific Ry. Co.* v. *United States,* supra; *International Salt Co.* v. *United States,* supra. It is only where motive and intent play leading roles that the court has indicated that summary procedures should be used sparingly. *Poller* v. *Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458; *Capital Temporaries, Inc. of Hartford* v. *Olsten Corporation,* 506 F.2d 658, 667 (2d Cir.). In the *Loew's* case, the Supreme Court noted that "it should seldom be necessary in a tie-in sale case to embark upon a full-scale factual inquiry into the scope of the relevant market for the tying product, and into the corollary problem of the seller's percentage share in that market." *United States* v. *Loew's, Inc.,* supra, 45n.

The plaintiff is entitled to judgment as a matter of law because it is clear from the pleadings and affidavits that (1) a tying arrangement did exist,

and (2) the tying arrangement satisfied the prerequisites for application of a per se rule of illegality. When a per se violation is demonstrated and found to exist, in such a case the restraint may be presumed to be illegal without further evidence. *Northern Pacific Ry. Co.* v. *United States,* supra.[8]

There is no error.

In this opinion the other judges concurred.

---

[8] Because our decision on the tying issue is dispositive of this appeal, no opinion is expressed on the boycott claim.