******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

THE RESERVE REALTY, LLC, ET AL. *v.* WINDEMERE
RESERVE, LLC, ET AL.
(AC 38167)

Alvord, Sheldon and Schaller, Js.

*Argued January 4—officially released June 20, 2017*

(Appeal from Superior Court, judicial district of
Danbury, Truglia, J.)

*Daniel E. Casagrande*, with whom was *Lisa M. Rivas*, for the appellants (plaintiffs).

*Christopher Rooney*, with whom was *Brian A. Daley*, for the appellees (named defendant et al.).

*Opinion*

SCHALLER, J. This appeal arises from a breach of contract action in which the plaintiffs, The Reserve Realty, LLC (Reserve Realty), and Theodore Haddad, Sr., as executor of the estate of Jeanette Haddad, sought to recover real estate brokerage fees in connection with the sale and/or lease of units in an apartment complex constructed and leased by the defendant BLT Reserve, LLC (BLT), and of commercial office space not yet constructed by the defendant Windemere Reserve, LLC (Windemere). After a trial to the court, judgment was rendered in favor of the defendants. The plaintiffs appeal from that judgment, claiming that the trial court improperly determined that (1) the purchase and sale agreements upon which they based their claims for brokerage fees constituted part of an illegal tying arrangement in violation of the Connecticut Antitrust Act, General Statutes § 35-24 et seq. (antitrust act), (2) the listing agreements entered into pursuant to such purchase and sale agreements did not comply with General Statutes § 20-325a, and (3) such listing agreements were unenforceable by the plaintiffs because they were personal to Jeanette Haddad. We affirm the judgment of the trial court.

The following facts, as found by the trial court in its memorandum of decision, are pertinent to our review. The plaintiff, Theodore Haddad, Sr., is the duly appointed executor of the estate of his wife, Jeanette Haddad. Prior to her death in January, 2013, Jeanette Haddad was a successful and highly regarded real estate broker in the Danbury real estate market, performing brokerage services under the business name, "Jeanette Haddad, Broker."[1] She employed several licensed salespersons, including Theodore Haddad, Sr., and she engaged the services of her son, Theodore Haddad, Jr., who was a licensed real estate broker with his own broker's license and business. The plaintiff, Reserve Realty, a limited liability company organized and existing pursuant to the laws of Connecticut, was founded by Jeanette Haddad and Paul Scalzo on September 15, 2003.[2] The defendants, BLT and Windemere, are limited liability companies, the principals and owners of which include Carl Kuehner, Jr., and Paul Kuehner.[3]

In early 2002, a group of real estate developers, later known as Woodland Group II, LLC (Woodland), contacted Jeanette Haddad and Century 21 Scalzo Realty, Inc. (Scalzo Realty), a real estate franchise owned by Scalzo,[4] to engage their brokerage services in connection with the negotiations for the purchase of a 546 acre parcel known as the Reserve. As part of the broker/ client relationship, the "Exclusive Right to Sell–Listing Agreement" (Woodland agreement) was executed by and between Jeanette Haddad and Scalzo, and two of the Woodland real estate developers. Pursuant to the

Woodland agreement, Jeanette Haddad and Scalzo Realty had the exclusive right to sell and/or lease property in the Reserve, and the real estate developers were required to "make aware to the new purchaser of any part, or of individual lots, or of land, that this Agreement shall apply to that new purchaser and [Jeanette Haddad and Scalzo Realty]."

On or about June 28, 2002, Woodland purchased the Reserve. Woodland, which wished to develop the Reserve, continued to use the services of Jeanette Haddad and Scalzo thereafter to market the property.[5] Woodland also proposed a master plan for the entire 546 acres, which the Danbury Zoning Commission approved on or about November 26, 2002. Shortly thereafter, Windemere filed an administrative appeal of the plan's approval in the Superior Court, which effectively stayed the approval of the master plan and prevented Woodland from moving forward with the development and sale of the Reserve. Thereafter, representatives of Woodland, Windemere, and BLT met to negotiate the sale of two tracts of land, later known as parcel 13 and parcel 15. Part of the negotiation resulted in Windemere's withdrawal of the administrative appeal.

On July 17, 2004, Woodland entered into the purchase and sale agreement with BLT for the purchase of parcel 13 and the purchase and sale agreement with Windemere for the purchase of parcel 15 (purchase and sale agreements). Paragraph eight of the purchase and sale agreement for parcel 13 obligated BLT to enter into a listing agreement with Jeanette Haddad and Scalzo Realty, pursuant to which Jeanette Haddad and Scalzo Realty would receive a 3 percent commission on any subsequent sale and/or lease of parcel 13, either as a whole or as individual lots. Similarly, paragraph eight of the purchase and sale agreement for parcel 15 obligated Windemere to enter into a listing agreement with Jeanette Haddad and Scalzo Realty, pursuant to which Jeanette Haddad and Scalzo Realty would receive a $1 million commission for their efforts in the leasing of office space that Windemere intended to develop on the parcel.[6]

Woodland, BLT, and Windemere also executed an escrow agreement, pursuant to which the purchase and sale agreements would be held in escrow by Woodland's counsel for ninety days until several conditions were met. One of the conditions was the execution of listing agreements and consent to sell the property agreements, to be executed by Jeanette Haddad and Scalzo Realty. This condition was included to satisfy the requirement in the Woodland agreement between Woodland, Jeanette Haddad, and Scalzo Realty that Woodland "make aware to the new purchaser of any part, or of individual lots, or of land, that this Agreement shall apply to that new purchaser and [Jeanette Haddad and Scalzo Realty]."

Between July 17 and September 10, 2003, representatives of Woodland, BLT, Windemere, and Jeanette Haddad[7] negotiated the terms of the listing agreements. On September 10, 2003, a meeting was held, at which several documents were executed,[8] including the exclusive right to represent buyer/tenant (buyer's agreement);[9] the consent agreements;[10] and the exclusive right to sell–listing agreement for parcel 13,[11] the exclusive right to sell/lease–listing agreement for parcel 13,[12] the exclusive right to sell/lease–listing agreement for parcel 15,[13] and the exclusive right to sell–listing agreement for parcel 15[14] (listing agreements).

Despite having executed the listing agreements, the defendants at no time desired to retain Jeanette Haddad as the broker for the sale and/or lease of units to be built on parcel 13 and parcel 15. Rather, the defendants entered into the listing agreements only to satisfy the requirements of paragraph eight of the purchase and sale agreements, and the only reason that the parties included paragraph eight in the purchase and sale agreements was to allow Woodland to comply with its contractual obligation under the Woodland agreement to require subsequent purchasers of the Reserve to retain Jeanette Haddad and Scalzo Realty as their brokers.

Beginning in early 2006, representatives of Jeanette Haddad and Scalzo Realty, including Theodore Haddad, Sr., and Theodore Haddad, Jr., diligently marketed and contacted possible buyers and lessees for the Reserve. At some point, however, the defendants decided that the listing agreements were a " 'bad marriage,' " and, in January, 2007, Paul Kuehner and Theodore Haddad, Jr., met to discuss terminating the broker/client relationship. A buy-out figure was offered to Jeanette Haddad and Scalzo, which they both refused. From early to mid-2007, Jeanette Haddad and Scalzo Realty continued to make best efforts to find prospective buyers or lessees for parcel 13 and parcel 15, but ultimately were unsuccessful. The defendants began to explore other available options, including the development of parcel 13 into a luxury apartment rental complex.

On or about April 18, 2011, the Danbury Planning and Zoning Department issued a site plan approval to BLT for the construction of a rental apartment complex on parcel 13, which would later be known as Abbey Woods. Shortly thereafter, the defendants began construction. BLT subsequently leased the apartment units in Abbey Woods through its own on-site leasing agent, with the first lease being entered into in March, 2013. Theodore Haddad, Jr., upon learning about Abbey Woods, contacted Carl Kuehner, Jr., and asked him if the defendants intended to honor the listing agreements by allowing Reserve Realty to act as broker and by paying commissions on those units already leased. Carl Kuehner, Jr., refused to discuss the issue with Theodore

Haddad, Jr., claiming that the listing agreements for parcel 13 were personal service agreements between BLT and Jeanette Haddad.

In July, 2013, the plaintiffs brought this action against the defendants, claiming compensatory damages for breach of the listing agreements.[15] Specifically, the plaintiffs sought the commissions for the leasing of apartments in the Abbey Woods complex built on parcel 13 and for the lease and/or sale of a commercial office building not yet constructed on parcel 15. The defendants raised five special defenses: (1) the listing agreements were entered into pursuant to an illegal tying arrangement; (2) there was a lack of consideration in that the plaintiffs had failed to perform brokerage services entitling them to compensation; (3) the listing agreements were personal service contracts; (4) the listing agreements, by their express terms, expired on September 10, 2010; and (5) the listing agreements were unenforceable because the necessary conditions precedent had not been satisfied. After hearing twelve days of evidence, the trial court rendered judgment in favor of the defendants, concluding that the purchase and sale agreements created an illegal tying arrangement, the listing agreements did not satisfy the requirements of § 20-325a, and the listing agreements were personal service contracts with Jeanette Haddad. The plaintiffs then filed this appeal. Additional facts will be set forth as necessary.

On appeal, the plaintiffs claim that the trial court improperly concluded that (1) the purchase and sale agreements constituted part of an illegal tying arrangement, (2) the listing agreements did not comply with § 20-325a, and (3) the listing agreements were personal to Jeanette Haddad. In order for the plaintiffs to succeed on appeal, they must prevail on all three of these claims. Because we conclude that the trial court properly determined that the purchase and sale agreements constituted part of an illegal tying arrangement, we need only address this antitrust issue in order to affirm the judgment of the trial court.

The plaintiffs claim that the defendants' agreement in the purchase and sale agreements to execute the listing agreements as a condition for purchasing parcel 13 and parcel 15 did not constitute an illegal tying arrangement in violation of the antitrust act. Specifically, the plaintiffs contend that the interpretation of illegal tying arrangements in *State* v. *Hossan-Maxwell, Inc.*, 181 Conn. 655, 436 A.2d 284 (1980), upon which the trial court relied, no longer applies because the rule of that case has been abrogated by recent federal case law. In addition, the plaintiffs contend that the defendants failed to plead or prove the existence of a relevant market, which they claim to be crucial to proving an illegal tying arrangement claim. Moreover, the plaintiffs contend that the defendants did not prove that the list-

ing agreements' requirement that BLT use Jeanette Haddad and Scalzo Realty to market Abbey Woods foreclosed competition in the market for brokerage services.[16] We disagree.

I

At the outset, we must determine the correct legal standards to apply to the facts as found by the trial court, particularly with regard to the alleged invalidity of *Hossan-Maxwell, Inc.* Indeed, the plaintiffs argue that recent federal case law has abrogated the rule of *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 655, the controlling authority for evaluating a tying arrangement claim under Connecticut antitrust law, specifically General Statutes § 35-29.[17] Furthermore, the plaintiffs contend that General Statutes § 35-44b[18] grants this court the authority to analyze the validity of *Hossan-Maxwell, Inc.*, in light of recent federal case law, particularly *Jefferson Parish Hospital District No. 2* v. *Hyde*, 466 U.S. 2, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984);[19] *Concord Associates, L.P.* v. *Entertainment Properties Trust*, 817 F.3d 46 (2d Cir. 2016; and *Smugglers Notch Homeowners' Assn., Inc.* v. *Smugglers' Notch Management Co.*, 414 Fed. Appx. 372 (2d Cir. 2011).

As an intermediate appellate court, we must follow the precedent established by our Supreme Court. As we have previously noted, "[o]ur duty is to follow controlling judicial precedent rather than base our decision on our own view or the popular view of what the law ought to be." *State* v. *Thurman*, 10 Conn. App. 302, 316, 523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 1152 (1987). Moreover, in interpreting § 35-44b, our Supreme Court has concluded that "[o]ur construction of the [antitrust act] is aided by reference to judicial opinions interpreting the federal antitrust statutes. . . . Accordingly, we follow federal precedent when we interpret the act *unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently*." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 15–16, 664 A.2d 719 (1995). Our Supreme Court has further stated that "§ 35-44b merely gave legislative imprimatur to what this court had been doing long before its enactment, namely, looking to case law construing relevant federal statutes as persuasive authority." *Miller's Pond Co., LLC* v. *New London*, 273 Conn. 786, 809–810, 873 A.2d 965 (2005). Accordingly, we are bound by the decision of our Supreme Court in *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 655. We, therefore, apply *Hossan-Maxwell, Inc.*, as a controlling interpretation of § 35-29.

II

Having concluded that § 35-29, as explained and applied in *Hossan-Maxwell, Inc.*, provides the govern-

ing standard to apply in the present action, we now consider whether the trial court applied it properly to the facts. We first set forth the standard of review that guides our interpretation of the antitrust act. "The scope of our appellate review depends on the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings are clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . . This court cannot retry the facts or pass upon the credibility of witnesses. . . . Furthermore, [o]ur function is not to examine the record to see if the trier of fact could have reached a contrary conclusion. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings." (Citations omitted; internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 14–15.

Tying arrangements were made illegal by § 3 of the Clayton Act, which was enacted October 15, 1914; see 15 U.S.C. § 14 (2012);[20] after which General Statutes § 35-29 was patterned. "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (tied) product, or at least agree that he will not purchase that product from another supplier. *Northern Pacific Ry. Co.* v. *United States*, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 [(1958)]." *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 659. "Tying arrangements are among the small group of practices which courts have found to be unlawful in and of themselves; *Northern Pacific Ry. Co.* v. *United States*, supra, 5; *International Salt Co.* v. *United States*, 332 U.S. 392, 396, 68 S. Ct. 12, 92 L. Ed. 20 [1947]; *Elida, Inc.* v. *Harmor Realty Corp.*, [177 Conn. 218, 227–28, 413 A.2d 1226 (1979)]. The justification for the per se approach is that [t]ying agreements serve hardly any purpose beyond the suppression of competition. *Standard Oil Co.* v. *United States*, 337 U.S. 293, 305, 69 S. Ct. 1051, 93 L. Ed. 1371 [(1949)]. Nonetheless, [it is only] when certain prerequisites are met, [that] arrangements of this kind are illegal in and of themselves, and no specific showing of unreasonable competitive effect is required. *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, 394 U.S. 495, 498, 89 S. Ct. 1252, 22 L. Ed. 2d 495 [(1969)]. . . . [T]ying arrangements [are] deemed per se illegal, whenever the party has sufficient economic power with

respect to the tying product to appreciably restrain free competition in the market for the tied product and a not insubstantial amount of interstate commerce is affected. *Northern Pacific Ry. Co.* v. *United States*, supra, 6." (Internal quotation marks omitted.) *State* v. *Hossan-Maxwell, Inc.*, supra, 660–61. Because § 35-29 is based on § 3 of the Clayton Act, and § 3 of the Clayton Act only requires the party to prove either sufficient economic power or a " 'not insubstantial' " effect on commerce, a tying arrangement is illegal if either condition is met.[21] Id., 661–62.

A

An illegal tying arrangement may be found if the tying party "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 661. Market power exists when "the seller has some special ability . . . to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hospital District No. 2* v. *Hyde*, supra, 466 U.S. 13–14. The United States Supreme Court has made clear that "the standard of sufficient economic power does not . . . require that the [seller] have a monopoly or even a dominant position throughout the market for the tying product." (Internal quotation marks omitted.) *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, supra, 394 U.S. 502; see *State* v. *Hossan-Maxwell, Inc.*, supra, 664. Moreover, "[e]ven absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." (Internal quotation marks omitted.) *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, supra, 503; see *State* v. *Hossan-Maxwell, Inc.*, supra, 664. "[T]he proper focus of concern is whether the seller has the power to raise prices, or to require other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product." *State* v. *Hossan-Maxwell, Inc.*, supra, 664.

In the present case, Woodland, the tying party, has imposed a tying arrangement upon all of the parcels that formed the Reserve, the tying product, by tying the purchase of any of the parcels to the purchase of Jeanette Haddad's and Scalzo Realty's brokerage services. This situation is similar to that in *Hossan-Maxwell, Inc.*, where sixty-four subdivision housing lots had restrictive covenants requiring all purchasers to give exclusive sales and leasing rights to the named brokerage services for three months.[22] *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 657–58. In *Hossan-Maxwell, Inc.*, our Supreme Court found that, based on federal precedent and Connecticut case law on property char-

acteristics,[23] the tying arrangement met the sufficient economic power test because the residential property was sufficiently unique that the tying party had some advantage in the market not shared by his competitors. Id., 665. Likewise, the record before this court supports the conclusion that the Reserve was sufficiently unique to infer that Woodland held sufficient economic power. The present action involves a substantially larger area of land than *Hossan-Maxwell, Inc.*, with the Reserve being comprised of 546 undeveloped acres. Such a large area of undeveloped land is rarely available in the densely populated Northeast. Moreover, the Danbury Planning and Zoning Department granted flexible zoning for the Reserve, so that both residential and commercial buildings could be constructed. Thus, parcel 13 was zoned for residential development, and parcel 15 was zoned for commercial development. According to the proposed master plan, the "plan seeks to achieve a balance between residential, commercial and other uses, recognizing that the site is sufficiently large and physically diverse to accommodate a development of a new, cohesive residential community . . . ." This flexibility was intended to create a unique community where people both could live and work within a short distance.

Consequently, we conclude that the Reserve is sufficiently unique that the trial court logically could have inferred that Woodland restrained free competition when it required subsequent purchasers of property in the Reserve to use the brokerage services of Jeanette Haddad and Scalzo Realty, because that requirement forced such purchasers to use a brokerage service that they would not have used otherwise. In fact, representatives of the defendants testified, and the trial court found credible, that they did not want to use Jeanette Haddad and Scalzo Realty, and that the only reason they did use their brokerage services was that the tying arrangement compelled them to do so, for the defendants otherwise would have lost the opportunity to purchase parcel 13 and parcel 15. Accordingly, we conclude that the trial court logically determined that Woodland possessed sufficient market power over the Reserve, and, therefore, an illegal tying arrangement existed.

The plaintiffs contend that the defendants did not successfully prove that Woodland had sufficient economic power with respect to the Reserve because they did not establish the relevant market for the Reserve. According to the plaintiffs, the establishment of a relevant market is a critical component to an antitrust claim because it is required to evaluate the extent to which the plaintiffs exercised power. In *Hossan-Maxwell, Inc.*, our Supreme Court did not find it necessary to identify the relevant market in which a unique property was situated when it determined that "the uniqueness of residential property is . . . sufficient evidence of

the market power possessed by the [tying party]." *State v. Hossan-Maxwell, Inc.*, supra, 181 Conn. 665. Moreover, in reaching its conclusion, our Supreme Court cited to *United State v. Loew's, Inc.*, 371 U.S. 38, 45 n.4, 83 S. Ct. 97, 9 L. Ed. 2d 11 (1962), in which the United States Supreme Court, when discussing the appropriateness of inferring economic power from uniqueness, noted that "[s]ince the requisite economic power may be found on the basis of either uniqueness or consumer appeal, and since the market dominance in the present context does not necessitate a demonstration of market power in the sense of § 2 of the Sherman Act, it should seldom be necessary in a [tying arrangement] case to embark upon a full-scale factual inquiry into the scope of the relevant market for the tying product and into the corollary problem of the seller's percentage share in that market."

Furthermore, in *Jefferson Parish Hospital District No. 2*, the United States Supreme Court made it clear that the establishment of a relevant market is not required when economic power is proven through a product's uniqueness. Specifically, it stated that "[w]hen the seller's share of the market is high . . . or when the seller offers a unique product that competitors are not able to offer . . . the Court has held that the likelihood that market power exists and is being used to restrain competition in a separate market is sufficient to make per se condemnation appropriate. . . . Thus, in *Northern Pacific R. Co.* v. *United States*, [supra, 356 U.S. 8], we held that the railroad's control over vast tracts of western real estate, although not itself unlawful, gave the railroad a unique kind of bargaining power that enabled it to tie the sales of that land to exclusive, long term commitments that fenced out competition in the transportation market over a protracted period." (Citations omitted.) *Jefferson Parish Hospital District No. 2* v. *Hyde*, supra, 466 U.S. 17. Consequently, we conclude that the defendants did not have to prove a relevant market to succeed on their claim that the Reserve was sufficiently unique to meet the sufficient economic power test.

### B

Alternatively, an illegal tying arrangement may be present when a "not insubstantial" amount of commerce in the tied product is restrained.[24] "The tying of brokerage services to the sale of residential development of real estate is automatically illegal under § 35-29 whenever a substantial volume of commerce in the tied product is restrained. . . . The amount of commerce affected is not measured by reference to the size of the tied product market. . . . [N]ormally, the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as to not be merely de minimis, is foreclosed to competitors by the tie, for as [the United

States Supreme Court] said in *International Salt* [*Co. v. United States*, supra, 332 U.S. 396], it is unreasonable, per se, to foreclose competitors from any substantial market through use of a tying arrangement." (Citations omitted; internal quotation marks omitted.) *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 662–63.

In the present case, the trial court found that "the market values of parcel 13 and parcel 15, and the commissions that would have been due to the plaintiffs upon resale or lease of the developed parcels, concerned a substantial amount of commerce in the tied market." The record before this court supports the trial court's finding. BLT paid $15 million for parcel 13, and, pursuant to the Woodland agreement between Woodland, Jeanette Haddad, and Scalzo Realty, Jeanette Haddad and Scalzo Realty were owed a 3 percent commission from the transaction. This calculates to a $450,000 commission. Moreover, paragraph eight of the purchase and sale agreement for parcel 13 includes language obligating BLT to enter into a listing agreement with Jeanette Haddad and Scalzo Realty, pursuant to which the two brokers would receive a 3 percent commission on any subsequent sale or lease of all or any portion of the parcel. After purchasing parcel 13, BLT received the approval of the Danbury Planning and Zoning Department to construct a rental apartment complex containing 470 units. With the units being rented for $1515 to $1910 a month, the total potential commerce involved for the first month of the initial lease of each unit is between $712,050 and $897,700, and the real estate commission foreclosed is between $21,361.50 and $26,931.

Moreover, Windemere paid $7 million for parcel 15, and, also pursuant to the Woodland agreement, Jeanette Haddad and Scalzo Realty were owed a 3 percent commission from the transaction. This calculates to a $210,000 commission for Jeanette Haddad and Scalzo Realty. Furthermore, paragraph eight of the purchase and sale agreement for parcel 15 included language obligating Windemere to enter into a listing agreement with Jeanette Haddad and Scalzo Realty, pursuant to which the brokers would receive a $1 million commission for their efforts to sell and/or lease the commercial office space that Windemere was intending to build on parcel 15. Thus, between parcel 13 and parcel 15, more than $1.5 million in brokerage fees was foreclosed, which is not a de minimis amount. See *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 663–64 ($60,800 was sufficient amount of money to meet "not insubstantial" test).[25] Accordingly, we conclude that the trial court logically determined that, by restricting the pool of brokers for the sale and/or lease of the Reserve, the arrangement between Woodland, Jeanette Haddad, and Scalzo Realty restricted a "not insubstantial" volume of commerce in the Reserve.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] To the extent that "Jeanette Haddad, Broker" is distinct from Jeanette Haddad, those distinctions are not material to our resolution of the claims on appeal.

[2] When formed, Reserve Realty was named UC Properties, LLC (UC Properties). On July 22, 2004, Scalzo filed articles of amendment, changing the name of the company from UC Properties to Reserve Realty.

[3] The Kuehner and Haddad families have been personal friends and business associates since the late 1970s.

[4] The plaintiffs moved to add Scalzo Realty as a necessary party to the action. The trial court granted the motion, ordering that the complaint be amended to state facts showing the interest of Scalzo Realty in the action and that Scalzo Realty appear as a defendant. Thereafter, Scalzo Realty was defaulted for failure to plead. Subsequently, the plaintiffs withdrew this action as to Scalzo Realty.

[5] Reserve Realty was formed by Jeanette Haddad and Scalzo to market and sell the Reserve as it became subdivided.

[6] Pursuant to paragraph twelve of the purchase and sale agreement for parcel 15, titled conditions of purchase, Woodland was required to obtain government approval for the development of a conference center and to provide Windemere with a site plan sketch for an office building so that Windemere could petition for a change in the master plan to allow for the construction of a large office space.

[7] Theodore Haddad, Jr., acted on behalf of Jeanette Haddad.

[8] The trial court determined that it was not clear precisely how the final, fully-executed hard copies of the agreements came to be executed by Jeanette Haddad. Although Theodore Haddad, Jr., testified that Jeanette Haddad was faxed the agreements on September 10, 2003, and she subsequently returned them with her signature via fax on the same day, the trial court did not find his testimony entirely credible. The trial court found, however, that Carl Kuehner, Jr., executed the agreements on behalf of both BLT and Windemere with the intent that the defendants be legally bound.

[9] In the buyer's agreement, the defendants appointed Scalzo Realty, UC Properties, and Jeanette Haddad as their exclusive agents to assist in the purchase of parcel 13 and parcel 15.

[10] The consent agreements did not address the defendants' obligation to use the plaintiffs' brokerage services.

[11] In the exclusive right to sell–listing agreement for parcel 13, BLT granted Jeanette Haddad and Scalzo Realty the exclusive right to sell and/or lease parcel 13.

[12] In the exclusive right to sell/lease–listing agreement for parcel 13, BLT granted UC Properties, Scalzo Realty, and Jeanette Haddad the exclusive right to sell and/or lease parcel 13 or any portion of parcel 13.

[13] In the exclusive right to sell/lease listing agreement for parcel 15, Windemere granted UC Properties, Scalzo Realty, and Jeanette Haddad the exclusive right to sell and/or lease parcel 15 or any portion of parcel 15.

[14] In the exclusive right to sell–listing agreement for parcel 15, Windemere granted Jeanette Haddad and Scalzo Realty the exclusive right to sell and/or lease parcel 15.

[15] Subsequently, on May 6, 2014, the plaintiffs commenced two actions seeking to foreclose liens that they had recorded as to parcel 13 and parcel 15 (foreclosure actions). On September 28, 2015, the parties filed a stipulation in each of the foreclosure actions, stipulating that the memorandum of decision in the present action required the conclusion that the plaintiffs could not establish probable cause to sustain the validity of the liens, as required by General Statutes § 20-325e. The parties, therefore, stipulated that judgment be rendered against the plaintiffs in the foreclosure actions, but that all appellate rights be reserved. The plaintiffs also have appealed from the judgments ordering the discharge of the liens. See *Reserve Realty, LLC* v. *BLT Reserve, LLC*, 174 Conn. App.    ,    A.3d    (2017); *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 174 Conn. App.    ,    A.3d    (2017).

[16] The plaintiffs further argued that the defendants' illegal tying arrangement claim must fail because it did not pass the rule of reason test. As subsequently discussed in this opinion, tying arrangements, due to their manifestly anticompetitive nature, fall under the per se test, not the rule of reason test.

[17] General Statutes § 35-29 provides in relevant part: "Every lease, sale or contract for the furnishing of services or for the sale of commodities . . . on the condition or understanding that the lessee or purchaser shall not

deal in the services or the commodities of a competitor or competitors of the lessor or seller, shall be unlawful where the effect of such lease or sale or contract for sale or such condition or understanding may be to substantially lessen competition or tend to create a monopoly in any part of trade or commerce and where such goods or services are for the use, consumption or resale in this state."

[18] General Statutes § 35-44b provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."

[19] But see *Illinois Tool Works, Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28, 31, 43–45, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006) (rejecting dicta from *Jefferson Parish Hospital District No. 2* regarding presumption that patents afforded sufficient market power to restrain competition in tied market).

[20] Section 3 of the Clayton Act, 15 U.S.C. § 14 (2012), provides in relevant part: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for the sale of . . . commodities . . . for use, consumption, or resale within the United States . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the . . . commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

[21] "Although both tests must be met to constitute a violation of § 1 of the Sherman [Antitrust Act 15 U.S.C § 1], under § 3 of the Clayton Antitrust Act; 15 U.S.C. § 14; a [tying arrangement] is per se illegal if either condition is met. *Times-Picayune Publishing Co.* v. *United States*, 345 U.S. 594, 608, 609, 73 S. Ct. 872, 97 L. Ed. 1277 [(1953)]; *Moore* v. *Jas. H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir. [1977]); *Advance Business Systems & Supply Co.* v. *SCM Corp.*, 415 F.2d 55, 61–62 (4th Cir. [1969]), cert. denied, 397 U.S. 920, 90 S. Ct. 928, 25 L. Ed. 2d 101 [(1970)]; *ILC Peripherals Leasing Corp.* v. *International Business Machines Corp.*, 448 F. Supp. 228, 230 (N.D. Cal. [1978]). Since General Statutes § 35-29 is patterned after § 3 of the Clayton [Antitrust] [A]ct; 14 H.R. Proc., Pt. 9, 1971 Sess., p. 4182 (remarks of Rep. David H. Neiditz); Brodigan, 'The Connecticut Antitrust Act,' 47 Conn. B.J. 12, 15 (1973); and specifically includes the provision of services within its ambit, we believe that it is appropriate to adopt the Clayton [Antitrust] [A]ct test in determining whether a violation of § 35-29 has occurred. Thus, the declaration of covenants and restrictions is unlawful per se if either condition under *Northern Pacific Ry. Co.* v. *United States*, supra, [356 U.S.] 6, is met; that is, if (1) the party has sufficient economic power in the tying product, or (2) a not insubstantial amount of commerce is affected." (Footnotes omitted.) *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 661–62.

[22] The plaintiffs claim that, even if this court is bound by *Hossan-Maxwell, Inc.*, the present action is distinguishable. Specifically, the plaintiffs argue that: (1) the covenants in *Hossan-Maxwell, Inc.*, bound all subsequent purchasers, whereas in the present case only Windemere and the first purchasers after BLT are bound; (2) the owner in *Hossan-Maxwell, Inc.*, was also the broker, and therefore had an economic interest in both the tying product and the tied product; (3) the purchasers in *Hossan-Maxwell, Inc.*, had no power to negotiate, whereas in the present case the defendants freely entered into the listing agreements after negotiations; and (4) the illegal clauses in the present case are part of otherwise valid agreements, and therefore the rule of reason test, not the per se test, should apply. For the reasons discussed subsequently in this opinion, we conclude that *Hossan-Maxwell, Inc.*, is analogous to the present case and, therefore, we are not persuaded by the plaintiffs' argument.

[23] "In Connecticut, the uniqueness and special characteristics of a particular plot of land have long been recognized." *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 665, citing *Anderson* v. *Yaworksi*, 120 Conn. 390, 395, 399, 181 A. 205 (1935).

[24] The plaintiffs failed to raise the issue as to a "not insubstantial" amount of commerce test in their main brief. Because this is an alternative test to finding a tying arrangement and it was a means by which the trial court found an illegal tying arrangement, however, we still address whether a "not insubstantial" amount of commerce was affected. In addition, the defendants argued in their briefs that a "not insubstantial" amount of commerce was foreclosed in the tied market for brokerage services, and the plaintiffs

addressed the issue in their reply brief.

[25] The total amount foreclosed is only a portion of the property of the Reserve being sold by Woodland with the tied brokerage services. See *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, supra, 394 U.S. 502 ("[f]or purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice . . . the relevant figure is the total volume of sales held by the sales policy under challenge, not the portion of [the] total accounted for by the particular plaintiff who brings suit"). The record indicates that additional buyers of the Reserve parcels included White Peterman for $13,931,000, with Jeanette Haddad and Scalzo Realty receiving a 3 percent commission, and WCI for approximately $44 million, with Jeanette Haddad and Scalzo Realty receiving a 3 percent commission.