******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

THE RESERVE REALTY, LLC, ET AL. *v.*
WINDEMERE RESERVE, LLC, ET AL.
(AC 38167)

THE RESERVE REALTY, LLC, ET AL. *v.*
BLT RESERVE, LLC, ET AL.
(AC 38440)

THE RESERVE REALTY, LLC, ET AL. *v.*
WINDEMERE RESERVE, LLC, ET AL.
(AC 38442)

Alvord, Prescott and Suarez, Js.

*Syllabus*

The plaintiffs, R Co., a real estate marketing company, and H, the executor
of the estate of J, a real estate broker who was a founding member of
R Co., sought to recover damages from the defendants W Co. and B
Co., for, inter alia, breach of certain real estate listing agreements that
allegedly would have entitled the plaintiffs to certain brokerage fees
and commissions. In 2002, a group of real estate developers, D Co.,
engaged the services of J and another real estate brokerage firm, S Co.,
to negotiate the purchase of a large parcel of undeveloped land. D Co.
thereafter entered into an agreement which, inter alia, gave J and S Co.
the exclusive right to sell and/or lease any property that was to be
developed on that land, and also required D Co. to inform any subsequent
purchasers of any part or individual lots on the land that the exclusivity
provision applied to them. After D Co. purchased the land, it sold two
separate parcels of the land to W Co. and B Co., who, pursuant to
their respective purchase agreements, executed a buyer's agreement
and listing agreements with J and S Co., who had formed R Co. for the
purpose of marketing the properties. Thereafter, B Co. constructed a
rental apartment complex on its parcel, and W Co. planned to develop
a commercial office building on its parcel. Neither B Co. nor W Co.
used R Co. as the listing agent for its respective project, and the plaintiffs
brought an action alleging a breach of the buyer's agreement and the
listing agreements. The plaintiffs also brought two actions seeking to
foreclose real estate broker's liens on the parcels of property that are
the subject of the breach of contract action. The trial court rendered
judgments discharging the liens in the foreclosure actions and judgment
in favor of W Co. and B Co. in the breach of contract action, concluding,
inter alia, that the purchase and sale agreements containing the exclusiv-
ity provision on which the plaintiffs based their claim for commissions
under the listing agreements constituted illegal tying arrangements and
violated the Connecticut Antitrust Act (§ 35-24 et seq.), and the listing
agreements did not satisfy statutory requirements (§ 20-325a) as to the
duration of the authorization. The court further concluded that the
agreements did not substantially comply with the statutory requirements
and that it was not inequitable to deny commissions to the plaintiffs
despite the lack of compliance. The plaintiffs appealed to this court,
which affirmed the trial court's judgments, concluding that the defen-
dants' antitrust special defense, under which the exclusivity provisions in
the purchase and sale agreements constituted illegal tying arrangements,
barred the plaintiffs' claims, pursuant to the governing standard set
forth in *State* v. *Hossan-Maxwell, Inc.* (181 Conn. 655). The plaintiffs,
on the granting of certification, appealed to our Supreme Court, which
overruled its decision in *Hossan-Maxwell, Inc.*, and concluded that the
trial court had incorrectly determined that the defendants prevailed
on their antitrust special defense and reversed this court's decision,
remanding the cases to this court with direction to consider the plaintiffs'
remaining claims. *Held*:

1. The trial court properly determined that the listing agreements were
   unenforceable because they failed to comply with the requirement of
   § 20-325a that they specify the duration of the broker's authorization to

act on behalf of W Co. and B Co.

a. The trial court erred in finding that the buyer's agreement and the listing agreements were ambiguous as to their intended duration; although the buyer's agreement had a stated duration of years, between September 10, 2003, and September 10, 2010, and the listing agreements had a stated duration of ten years from the date of the first sale or lease, the intent of the parties was to create different durations for different transactions, thus, effect can be given to both provisions, which used definitive language, and this court did not consider extrinsic evidence regarding the parties' intent.

b. The trial court correctly determined that the listing agreements did not strictly comply with the duration requirements of § 20-325a (b) and/or (c) and such failure was contrary to public policy and custom in the commercial real estate industry, as the agreements failed to set forth a measurable, definite duration; although the agreements specified a ten year period, it was unclear, at the time the agreements were executed, how far into the future the parties would be bound by the provision, and the provision did not provide a ceiling on the ultimate amount of time the agreements could last, as the amount of time for which the parties could be bound by the agreements was indeterminate because it could only be calculated by reference to an uncertain future event, the conveyance of an individual unit or executed lease.

2. The trial court's finding that it would not be inequitable to deny the plaintiffs' recovery was not clearly erroneous: the listing agreements did not substantially comply with § 20-325a (b) and/or (c), as they were indefinite as to the key element of the duration of the agreement, which was imperative to the parties' understanding of their respective rights under the contracts; moreover, it was not inequitable to deny recovery of commissions under the circumstances in which there was no sale or lease with regard to either parcel of property until almost ten years after the listing contracts were executed, the evidence having supported conclusions that the plaintiffs failed to use best efforts to market the properties and that the defendants did not wrongfully prevent the plaintiffs from performing their obligations under the listing agreements, and, once the plaintiffs became aware of the rental apartment complex constructed by B Co., they made no effort to lease the apartments.

Argued December 2, 2020—officially released June 22, 2021

*Procedural History*

Action, in the first case, to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the case was tried to the court, *Truglia, J.*; judgment for the named defendant et al., from which the plaintiffs appealed to this court, *Alvord, Sheldon* and *Schaller, Js.*, which affirmed the trial court's judgment; thereafter, in the second and third cases, the court, *Truglia, J.*, rendered judgments discharging broker's liens on certain real property of the named defendant in each case in accordance with the parties' stipulations, from which the plaintiffs filed separate appeals to this court, *Alvord, Sheldon* and *Schaller, Js.*, which affirmed the judgments of the trial court, and the plaintiffs, on the granting of certification, filed separate appeals from all three cases with the Supreme Court, which reversed this court's judgments and remanded the cases to this court for further proceedings. *Affirmed.*

*Daniel E. Casagrande*, with whom, on the brief, was *Lisa M. Rivas*, for the appellants (plaintiffs in each case).

*J. Christopher Rooney*, with whom were *Drew J. Cunningham*, and, on the brief, *Brian A. Daley*, for the appellees in Docket No. AC 38167 (defendants).

*J. Christopher Rooney*, with whom were *Drew J. Cunningham*, and, on the brief, *Brian A. Daley*, for the appellees in Docket Nos. AC 38440 and AC 38442 (named defendant et al.).

*David F. Bennett* submitted a brief for the appellee in Docket Nos. AC 38440 and AC 38442 (defendant Century 21 Scalzo Realty, Inc.).

*Opinion*

PRESCOTT, J. These appeals, which return to us on remand from our Supreme Court, presently require us to determine whether certain real estate listing agreements are unenforceable because they fail to comply with the requirement contained in General Statutes § 20-325a that such agreements specify the duration of the authorization. Specifically, the plaintiffs, The Reserve Realty, LLC (Reserve Realty), and Theodore Haddad, Sr., as executor of the estate of Jeanette Haddad, seek to recover real estate brokerage fees (commissions) in connection with the sale and/or lease of (1) units in an apartment complex constructed and leased by the defendant BLT Reserve, LLC (BLT), and (2) commercial office space not yet constructed by the defendant Windemere Reserve, LLC (Windemere).[1] For the reasons we set forth, we conclude that the trial court properly determined that the listing agreements are unenforceable because they fail to comply with § 20-325a and, accordingly, affirm the judgments of the trial court.[2]

The following facts and procedural history, as set forth in this court's opinion in *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 174 Conn. App. 130, 165 A.3d 162 (2017) (*Reserve Realty I*), rev'd, 335 Conn. 174, 229 A.3d 708 (2020), or which are otherwise undisputed in the record, are relevant to our resolution of these appeals. "The plaintiff, Theodore Haddad, Sr., is the duly appointed executor of the estate of his wife, Jeanette Haddad. Prior to her death in January, 2013, Jeanette Haddad was a successful and highly regarded real estate broker in the Danbury real estate market, performing brokerage services under the business name, 'Jeanette Haddad, Broker.'[3] She employed several licensed salespersons, including Theodore Haddad, Sr., and she engaged the services of her son, Theodore Haddad, Jr., who was a licensed real estate broker with his own broker's license and business. The plaintiff, Reserve Realty, a limited liability company organized and existing pursuant to the laws of Connecticut, was founded by Jeanette Haddad and Paul Scalzo on September 15, 2003.[4] The defendants, BLT and Windemere, are limited liability companies, the principals and owners of which include Carl Kuehner, Jr., and Paul Kuehner.[5]

"In early 2002, a group of real estate developers, later known as Woodland Group II, LLC (Woodland), contacted Jeanette Haddad and Century 21 Scalzo Realty, Inc. (Scalzo Realty), a real estate franchise owned by Scalzo,[6] to engage their brokerage services in connection with the negotiations for the purchase of a 546 acre parcel known as the Reserve. As part of the broker/client relationship, the 'Exclusive right to Sell–Listing Agreement' (Woodland agreement) was executed by and between Jeanette Haddad and Scalzo, and two of the Woodland real estate developers. Pursuant to the

Woodland agreement, Jeanette Haddad and Scalzo Realty had the exclusive right to sell and/or lease property in the Reserve, and the real estate developers were required to 'make aware to the new purchaser of any part, or of individual lots, or of land, that this Agreement shall apply to that new purchaser and [Jeanette Haddad and Scalzo Realty].'

"On or about June 28, 2002, Woodland purchased the Reserve. Woodland, which wished to develop the Reserve, continued to use the services of Jeanette Haddad and Scalzo thereafter to market the property. Woodland also proposed a master plan for the entire 546 acres, which the Danbury Zoning Commission approved on or about November 26, 2002. Shortly thereafter, Windemere filed an administrative appeal of the plan's approval in the Superior Court, which effectively stayed the approval of the master plan and prevented Woodland from moving forward with the development and sale of the Reserve. Thereafter, representatives of Woodland, Windemere, and BLT met to negotiate the sale of two tracts of land, later known as parcel 13 and parcel 15. Part of the negotiation resulted in Windemere's withdrawal of the administrative appeal.

"On July 17, 2003, Woodland entered into the purchase and sale agreement with BLT for the purchase of parcel 13 and the purchase and sale agreement with Windemere for the purchase of parcel 15 (purchase and sale agreements). Paragraph eight of the purchase and sale agreement for parcel 13 obligated BLT to enter into a listing agreement with Jeanette Haddad and Scalzo Realty, pursuant to which Jeanette Haddad and Scalzo Realty would receive a 3 percent commission on any subsequent sale and/or lease of parcel 13, either as a whole or as individual lots. Similarly, paragraph eight of the purchase and sale agreement for parcel 15 obligated Windemere to enter into a listing agreement with Jeanette Haddad and Scalzo Realty, pursuant to which Jeanette Haddad and Scalzo Realty would receive a $1 million commission for their efforts in the leasing of office space that Windemere intended to develop on the parcel.

"Woodland, BLT, and Windemere also executed an escrow agreement, pursuant to which the purchase and sale agreements would be held in escrow by Woodland's counsel for ninety days until several conditions were met. One of the conditions was the execution of listing agreements . . . to be executed by Jeanette Haddad and Scalzo Realty. This condition was included to satisfy the requirement in the Woodland agreement . . . that Woodland 'make aware to the new purchaser of any part, or of individual lots, or of land, that this Agreement shall apply to that new purchaser and [Jeanette Haddad and Scalzo Realty.]'

"Between July 17 and September 10, 2003, representatives of Woodland, BLT, Windemere, and Jeanette Had-

dad[7] negotiated the terms of the listing agreements. On September 10, 2003, a meeting was held, at which several documents were executed,[8] including the exclusive right to represent buyer/tenant (buyer's agreement);[9] the consent agreements;[10] the exclusive right to sell–listing agreement for parcel 13;[11] the exclusive right to sell/lease–listing agreement for parcel 13;[12] the exclusive right to sell/lease–listing agreement for parcel 15;[13] and the exclusive right to sell–listing agreement for parcel 15[14] (listing agreements).[15]

"Despite having executed the listing agreements, the defendants at no time desired to retain Jeanette Haddad as the broker for the sale and/or lease of units to be built on parcel 13 and parcel 15. Rather, the defendants entered into the listing agreements only to satisfy the requirements of paragraph eight of the purchase and sale agreements, and the only reason that the parties included paragraph eight in the purchase and sale agreements was to allow Woodland to comply with its contractual obligation under the Woodland agreement to require subsequent purchasers of the Reserve to retain Jeanette Haddad and Scalzo Realty as their brokers.

"Beginning in early 2006, representatives of Jeanette Haddad and Scalzo Realty, including Theodore Haddad, Sr., and Theodore Haddad, Jr., diligently marketed and contacted possible buyers and lessees for the Reserve. At some point, however, the defendants decided that the listing agreements were a ' "bad marriage,' " and, in January, 2007, Paul Kuehner and Theodore Haddad, Jr., met to discuss terminating the broker/client relationship. A buyout figure was offered to Jeanette Haddad and Scalzo, which they both refused. . . . [Although Jeanette Haddad and Scalzo Realty continued to make good faith efforts to find prospective buyers or lessees for parcel 13 and parcel 15 until mid-2007, the real estate market softened, and those efforts ultimately were unsuccessful.] The defendants began to explore other available options, including the development of parcel 13 into a luxury apartment rental complex.

"On or about April 18, 2011, the Danbury Planning and Zoning Department issued a site plan approval to BLT for the construction of a rental apartment complex on parcel 13, which would later be known as Abbey Woods. Shortly thereafter, the defendants began construction. BLT subsequently leased the apartment units in Abbey Woods through its own on-site leasing agent, with the first lease being entered into in March, 2013." (Footnotes in original; footnote added; footnotes omitted.) *Reserve Realty I*, supra, 174 Conn. App. 132–37.

The defendants did not notify the Haddads[16] or Scalzo of the site plan approval for, or the construction of, the Abbey Woods apartments. Theodore Haddad, Jr., upon learning about Abbey Woods in 2013, shortly after his mother had died, contacted Carl Kuehner, Jr., and asked him if the defendants intended to honor the listing

agreements. Carl Kuehner, Jr., refused to discuss the issue with Theodore Haddad, Jr., claiming that the listing agreements for parcel 13 were personal service agreements between BLT and Jeanette Haddad.

In July, 2013, the plaintiffs brought this action alleging breach of contract and anticipatory breach with regard to the buyer's agreement and listing agreements[17] for both parcel 13 and parcel 15.[18] Specifically, the plaintiffs (1) claimed that they are entitled to their percentage of commission of gross rentals from the Abbey Woods units already leased, and a percentage of estimated gross rental receipts yet to be realized by BLT for this development over the ten year term of the agreement that began on the date of the first lease; (2) asked the court to recognize their claim for a $1,000,000 commission for office space that will be due and payable when Windemere constructs and begins leasing office space on parcel 15; and (3) sought a declaratory judgment recognizing their right to serve as the exclusive listing agents henceforward for the sale and/or lease of any Abbey Woods units and office space on parcel 15.

"The defendants raised five special defenses: (1) the listing agreements were entered into pursuant to an illegal tying arrangement; (2) there was a lack of consideration in that the plaintiffs had failed to perform brokerage services entitling them to compensation; (3) the listing agreements were personal service contracts; (4) the listing agreements, by their express terms, expired on September 10, 2010; and (5) the listing agreements were unenforceable because the necessary conditions precedent had not been satisfied." *Reserve Realty I*, supra, 174 Conn. App. 138. After hearing twelve days of evidence, the trial court rendered judgment in favor of the defendants, concluding that the purchase and sale agreements created an illegal tying arrangement that violates the Connecticut Antitrust Act, General Statutes § 35-24 et seq., and that the plaintiffs had not carried their burden of proof by a preponderance of the evidence that the defendants breached the listing agreements or are liable for an anticipatory breach because such listing agreements (1) did not satisfy the requirements of § 20-325a, and (2) were personal service contracts with Jeanette Haddad.

With regard to the issue of compliance with § 20-325a, the court first found that the parties intended for the buyer's agreement and the listing agreements to be read and interpreted together as one contract "notwithstanding the integration clauses of the preprinted form agreements and the discrepancies between which of the plaintiffs are parties to the respective agreements," because the documents were signed by the defendants at the same time and date.[19] The court then went on to conclude that the agreements were ambiguous and incomplete as to the duration of the authorization, which is a term that must be included in any agreement

for commissions in a commercial real estate transaction pursuant to § 20-325a. Specifically, the court stated that "[t]he evidence adduced at trial was evenly balanced between two findings: (1) that all of the agreements were intended to expire on September 10, 2010 . . . and (2) that the term of the agreements began with the date of the first sale or lease of a unit and continue[s] for a period of ten years thereafter. . . . In other words, the agreements either expire by their express terms on September 10, 2010, or the agreements have no fixed expiration date and are, therefore, invalid for failure to comply with § 20-325a."[20]

In addition, the court rejected the plaintiffs' further arguments that they were entitled to commissions because (1) the agreements substantially comply with the statutory requirements, (2) the plaintiffs substantially performed their obligations under the agreements or were prevented from doing so, thereby excusing further performance, and (3) the court should intervene in equity to find that a commission is due and payable despite a lack of compliance. The court reasoned that, "[f]irst, Jeanette Haddad did not, prior to her death, interest a ready, willing, and able buyer or lessee in any of the [p]arcel 13 units, nor did Theodore Haddad, Sr., Theodore Haddad, Jr., or [Garland] Warren,[21] acting on her behalf or on behalf of Reserve Realty. Second, the lack of a definite expiration date is too significant a lapse in the statutory requirements to overlook."

Furthermore, with respect to the plaintiffs' argument that they were prevented from performing their obligations under the agreements, the court stated: "The court does not find that [after the fall of 2007], the defendants 'land banked' the parcels, as suggested by the plaintiffs, that is, taking the property off the market and thereby excusing the plaintiffs from further performance. The court finds, rather, that had Jeanette Haddad or Scalzo found a valuable and qualified prospect during this time, the defendants would have been happy to entertain it. The court further finds that the defendants simply waited for a prospective buyer to meet their demands, and in the meantime employed all available options."

The plaintiffs appealed, claiming that the trial court improperly concluded that (1) the purchase and sale agreements constituted part of an illegal tying arrangement in violation of the Connecticut Antitrust Act, (2) the listing agreements did not comply with § 20-325a because they were ambiguous and incomplete as to the duration of the authorization, and (3) the listing agreements were unenforceable by the plaintiffs because they were personal service contracts of Jeanette Haddad. As previously noted, this court affirmed the judgment of the trial court on the ground that the defendants' antitrust special defense barred the plaintiffs' claims, pursuant to the governing standard set forth in *State* v. *Hossan-Maxwell, Inc.*, 181 Conn. 655, 436 A.2d 284 (1980).

See *Reserve Realty I*, supra, 174 Conn. App. 141. Our Supreme Court, in *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 335 Conn. 174, 204, 211, 229 A.3d 708 (2020) (*Reserve Realty II*), overruled *Hossan-Maxwell, Inc.*, reversed this court's decision with regard to the defendants' antitrust special defense, and remanded the case to this court with direction to consider the plaintiffs' remaining claims. Additional facts will be set forth as needed.

The plaintiffs' claim that the trial court improperly concluded that the listing agreements do not satisfy the requirements of § 20-325a is twofold. Specifically, the plaintiffs contend that the listing agreements strictly comply with the duration requirement set forth in § 20-325a (b) and/or (c) (2). The plaintiffs also maintain that, even if the listing agreements do not strictly comply with § 20-325a (b) and/or (c) (2), they are nevertheless entitled to commissions pursuant to § 20-325a (d) because the listing agreements substantially comply with subsections (b) and/or (c) (2), and it would be inequitable to deny them recovery. For the reasons that follow, we disagree with the plaintiffs and, accordingly, affirm the judgment of the trial court.

I

"The right of a real estate broker to recover a commission is dependent upon whether the listing agreement meets the requirements of § 20-325a (b). . . . It is well established that the requirements of § 20-325a (b) are mandatory rather than permissive and that *the statute is to be strictly construed.* . . . A broker who does not follow the mandate of [§ 20-325a (b)] does so at his [own] peril." (Emphasis added; internal quotation marks omitted.) *NRT New England, LLC* v. *Jones*, 162 Conn. App. 840, 848, 134 A.3d 632 (2016).

Section 20-325a (b) provides in relevant part: "No person, licensed under the provisions of this chapter, shall commence or bring any action with respect to any acts done or services rendered after October 1, 1995 . . . unless the acts or services were rendered pursuant to a contract or authorization from the person for whom the acts were done or services rendered. To satisfy the requirements of this subsection any contract or authorization shall . . . *contain the conditions of such contract or authorization* . . . ." (Emphasis added.) In addition, with specific regard to commercial real estate transactions,[22] § 20-325a (c), which is not a model of grammatical clarity, essentially provides that a licensed real estate broker cannot bring any action to recover commissions for acts or services rendered unless the acts or services were rendered pursuant to either a contract or authorization meeting the requirements of subsection (b), *or* a writing stating (1) for whom the licensee will act or has acted, signed by the party for whom the licensee will act or has acted, (2) the *duration of the authorization,* and (3) the amount of any com-

pensation payable to the licensee. Similarly, the pertinent regulation; Regs., Conn. State Agencies § 20-328-6a (d); provides in relevant part that a "licensee attempting to negotiate or negotiating a sale, exchange, or lease of a commercial real estate transaction shall obtain a listing, buyer or tenant representation agreement, memorandum, letter or other writing stating . . . *the duration of the authorization . . . .*" (Emphasis added.) See also General Statutes § 20-328 (statutory authority for regulation). Therefore, for the listing agreements at issue to comply with § 20-325a (b) and/or (c) (2), and, thus, entitle the plaintiffs to recover commissions, they must specify the duration of the authorization.

"To the extent that we are required to review conclusions of law or the interpretation of the relevant statute by the trial court, we engage in plenary review. . . . We review the court's factual findings, however, under a clearly erroneous standard. . . . [W]hether a particular listing agreement complies with § 20-325a (b) is a question of law." (Citation omitted; internal quotation marks omitted.) *NRT New England, LLC* v. *Jones*, supra, 162 Conn. App. 846.

A

We begin by construing the agreements at issue to determine the parties' intent as to the duration of the authorization. When the trial court construed the agreements, it determined that they were ambiguous as to duration and that the evidence adduced at trial was evenly balanced between a finding that (1) all of the agreements were intended to expire on September 10, 2010, and (2) the term of the agreements began with the date of the first sale or lease of a unit and continues for a period of ten years thereafter. The plaintiffs dispute these findings, arguing that it was improper for the court to conclude that the agreements were ambiguous as to duration because the different provisions in the buyer's agreement and the listing agreements are not in conflict, and the court's determination in this regard was based on a purported inconsistency that no party had ever found or voiced. We agree with the plaintiffs that the agreements are not ambiguous as to the intended duration.

"The law governing the construction of contracts is well settled. When a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous." (Internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 13, 938 A.2d 576 (2008). "The court's determination as to whether a contract is ambiguous is a question of law; our standard of review, therefore, is de novo." (Internal quotation marks omitted.) *Santos* v. *Massad-Zion Motor Sales Co.*, 160 Conn. App. 12, 18, 123 A.3d 883, cert. denied, 319 Conn. 959, 125 A.3d 1013 (2015). "The intent of the parties as expressed in a con-

tract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, 279 Conn. 90, 109, 900 A.2d 1242 (2006).

"[A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. . . . The fact that the parties interpret the terms of a contract differently, however, does not render those terms ambiguous. . . . [W]e accord the language employed in the contract a rational construction based on its common, natural, and ordinary meaning and usage as applied to the subject matter of the contract. . . . Moreover, in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Citation omitted; internal quotation marks omitted.) *A.C. Consulting, LLC* v. *Alexion Pharmaceuticals, Inc.*, 194 Conn. App. 316, 326–27, 220 A.3d 890 (2019). "Each word must be considered along with not only all the other words that surround it, but also the history and education of the parties, the nature of the contract, the purposes of the parties, and all other relevant circumstances." (Footnote omitted.) 5 M. Kniffin, Corbin on Contracts (Rev. Ed. 1998) § 24.21, p. 210. With these principles in mind, we turn to the language of the agreements at issue.

The buyer's agreement provides, inter alia, that "You (BUYER(S)/TENANT(S): BLT Reserve, LLC and Windemere Reserve, LLC appoint us . . . Jeanette Haddad, Broker, [Scalzo Realty], and UC Properties, LLC as your exclusive agent to assist you to locate and purchase/ option/exchange/lease real property acceptable to you. . . . The type of property you would like to purchase/ option/exchange/lease is: GENERAL PROPERTY DESCRIPTION: Parcels #13 and #15—Portions of The Reserve." There are four documents that comprise the listing agreements. Two of the documents provide, inter alia, that BLT and Windemere "hereby [grant] to Broker the Exclusive Right to Sell and/or Lease the Property [more particularly described as parcel 13 and parcel 15]. [BLT and Windemere] shall not on [their] own or in conjunction with others sell and/or lease the Property without written approval from Broker, nor shall [they] grant any such rights to anyone else during the term of this Agreement." The other two documents comprising the listing agreements provide, inter alia, that "Buyer hereby grants to Broker the Exclusive Right to Sell and/ or Lease the Property [defined as parcel 13 and parcel

15 in the respective documents] and any portion thereof pursuant to the terms and conditions set forth herein and in the attached Agreement."

The listing agreements at issue are exclusive right to sell listing agreements.[23] "[T]hree types of real estate listing agreements have traditionally been used in this state . . . . Those categories are: the open listing, under which the property owner agrees to pay the listing broker a commission if that broker effects the sale of the property but retains the right to sell the property himself as well as the right to procure the services of any other broker in the sale of the property; the exclusive agency listing, which is for a time certain and authorizes only one broker to sell the property but permits the property owner to sell the property himself without incurring a commission . . . and *the exclusive right to sell listing, under which the sale of the property during the contract period, no matter by whom negotiated, obligates the property owner to pay a commission to the listing broker*." (Citations omitted; emphasis added.) *Real Estate Listing Service, Inc.* v. *Connecticut Real Estate Commission*, 179 Conn. 128, 132, 425 A.2d 581 (1979).[24]

With regard to the provisions in the agreements that relate to duration, the buyer's agreement states: "Term: This agreement is in effect from 9/10/03, through and including 9/10/10." By contrast, two of the documents comprising the listing agreements state: "Term: The term of this Agreement shall begin at the time Developer becomes the owner . . . and be for a period of One Hundred and Twenty, (120), months from the date of the first conveyance of an individual unit or executed lease to an unrelated party of Developer and shall be renewable by mutual agreement by both parties."

The plaintiffs argue that, contrary to the trial court's findings, the intent of the parties, which is definitively expressed in the agreements, was "to create different durations for different transactions." That is, the buyer's agreement, by its terms, obligated the defendants to use the named brokers as their representatives in *purchasing* parcels 13 and 15 from Woodland, while the listing agreements obligated the defendants to use the named brokers as their exclusive agents in the subsequent *marketing and sale and/or leasing* of the parcels. In response, the defendants argue that when reading and interpreting the five agreements together as one contract, the court correctly concluded that they were conflicting as to the time frame governing the parties' relationship, and thus ambiguous. We agree with the plaintiffs.

When viewed in isolation, the two durational provisions seem to be contradictory. When viewed, however, in the context of the entirety of the documents in which they are contained, it is clear that there is a way to give effect to both provisions, as we must. See *A.C.*

*Consulting, LLC* v. *Alexion Pharmaceuticals, Inc.*, supra, 194 Conn. App. 327. That is to say that the buyer's agreement and the listing agreements governed different aspects of the relationship between the parties. Specifically, the buyer's agreement granted the named brokers the exclusive right to represent BLT and Windemere in purchasing parcels 13 and 15 from Woodland, and such authorization expired on September 10, 2010. The listing agreements, by contrast, granted the named brokers the exclusive right to sell/lease parcels 13 and 15, or portions thereof, on behalf of BLT and Windemere for a period of ten years from the date of the first conveyance of an individual unit or executed lease to an unrelated party, after BLT and Windemere had acquired ownership of the parcels.

As of the September 10, 2003 meeting, at which the buyer's agreement and listing agreements were executed, the defendants already had executed purchase and sale agreements for parcels 13 and 15 that were being held in escrow by Woodland's counsel for ninety days until certain conditions were met. One such condition was that the defendants enter into listing agreements with the brokers named in the purchase and sale agreements. It strains credulity that the defendants would have granted the brokers seven years to assist with a sale that was essentially finalized on September 10, 2003. On the other hand, these are commercial contracts made by sophisticated parties with the advice of counsel. Accordingly, we presume that "the parties meant what they said and said what they meant, in language sufficiently definitive to obviate any need for deference to the trial court's factual findings as to the parties' intent." *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 497, 746 A.2d 1277 (2000). As our Supreme Court explained in *Tallmadge Bros., Inc.*, when the contracts at issue are commercial in nature and were made by sophisticated commercial parties with the advice of counsel, there is "a presumption of definitiveness,"[25] meaning that in interpreting such contracts we presume that the parties used definitive language to describe their agreement. Id., 496–97; see also *Schwartz* v. *Family Dental Group, P.C.*, 106 Conn. App. 765, 773, 943 A.2d 1122 ("[C]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law." (Internal quotation marks omitted.)), cert. denied, 288 Conn. 911, 954 A.2d 184 (2008). Indeed, because the language in the listing agreements is definitive, we do not consider any extrinsic evidence regarding the parties' intent.[26]

### B

Having concluded that the agreements are unambiguous as to the parties' intent that the September 10, 2010 expiration date set forth in the buyer's agreement only

pertains to the brokers' authority to represent the defendants in purchasing parcels 13 and 15 from Woodland, we now turn to the issue of whether the provision governing the duration of the brokers' authority to act as the defendants' exclusive listing agent to market and sell and/or lease parcels 13 and 15, or portions thereof, strictly complies with the requirement of § 20-325a (b) and/or (c). This determination presents a question of law. See *NRT New England, LLC* v. *Jones*, supra, 162 Conn. App. 846.

For ease of reference, we restate the language of the provision at issue, and the relevant statutory and regulatory provisions. The agreement provision at issue states, "Term: The term of this Agreement shall begin at the time Developer becomes the owner . . . and be for a period of One Hundred and Twenty, (120), months from the date of the first conveyance of an individual unit or executed lease to an unrelated party of Developer, and shall be renewable by mutual agreement by both parties." Section 20-325a (b) provides in relevant part: "No person, licensed under the provisions of this chapter, shall commence or bring any action with respect to any acts done or services rendered . . . unless the acts or services were rendered pursuant to a contract or authorization from the person for whom the acts were done or services rendered. To satisfy the requirements of this subsection any contract or authorization shall . . . *contain the conditions of such contract or authorization* . . . ." (Emphasis added.) In addition, § 20-325a (c), which specifically governs commercial real estate transactions, provides that a licensed real estate broker cannot bring any action to recover commissions for acts or services rendered unless the acts or services were rendered pursuant to either a contract or authorization meeting the requirements of subsection (b), *or* a writing stating (1) for whom the licensee will act or has acted, signed by the party for whom the licensee will act or has acted (2) the *duration of the authorization*, and (3) the amount of any compensation payable to the licensee. Similarly, the pertinent regulation provides in relevant part that a "licensee attempting to negotiate or negotiating a sale, exchange or lease of a commercial real estate transaction shall obtain a listing, buyer or tenant representation agreement, memorandum, letter, or other writing stating . . . *the duration of the authorization* . . . ." (Emphasis added.) Regs., Conn. State Agencies § 20-328-6a (d).

The trial court, when addressing this issue, reasoned, inter alia, that the language in § 20-235a (b) providing that a listing agreement must include "the conditions of such contract or authorization" means that a listing agreement must contain "all of the terms and conditions of the sale, exchange or lease, including . . . the date on which the agreement is entered into and its *expiration date*." (Emphasis added; internal quotation marks omitted.) For the latter proposition, the court improp-

erly relied upon § 20-328-6a (a) (1) of the Regulations of Connecticut State Agencies, which, by its terms, does not apply if a broker is attempting to negotiate a commercial real estate transaction.[27] Although the Abbey Woods complex on parcel 13 is comprised of residential apartments, it is properly characterized as a "commercial real estate transaction" as that term is defined in General Statutes § 20-311 (9) because there are 470 units in the complex and, thus, it is not a "building or structure occupied or intended to be occupied by no more than four families or a single building lot to be used for family or household purposes." See footnote 21 of this opinion.

Subsection (d) of § 20-328-6a of the Regulations of Connecticut State Agencies applies to commercial real estate transactions, and it provides that listing agreements must state "the duration of the authorization." Therefore, to the extent that the trial court concluded that the listing agreements in the present case were invalid for failure to comply with § 20-235a because they did not contain an expiration date, we disagree. The proper inquiry is not whether the listing agreements contain an expiration date, but rather whether they specify the "duration" of the broker's authorization to act on behalf of the defendants. See *Location Realty, Inc.* v. *Colaccino*, 287 Conn. 706, 718, 949 A.2d 1189 (2008) ("there is a more flexible standard for a writing in commercial real estate transactions than that which applies to noncommercial transactions"). To answer this question, we must interpret the meaning of the term "duration" as it is used in § 20-235a. "This presents a question of statutory interpretation over which our review is plenary." *Casey* v. *Lamont*, Conn. , , A.3d (2021).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z[28] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Footnote added; internal quotation marks omitted.) *Donahue* v. *Veridiem, Inc.*, 291 Conn. 537, 547, 970 A.2d 630 (2009). "In interpreting statutes, words and phrases are to be construed according to their commonly approved usage . . . . Generally, in the absence of statutory definitions, we look to the contemporaneous dictionary definitions of words to ascertain their commonly approved usage." (Citations omitted; internal quotation marks omitted.) *Ledyard* v. *WMS Gaming, Inc.*, Conn. , , A.3d (2021).

The term "duration" is not defined in § 20-325a, chap-

ter 392 of the General Statutes, nor in title 20 of the Regulations of Connecticut State Agencies. Accordingly, we look to its common dictionary definition. See *Casey* v. *Lamont*, supra, Conn. . Webster's Dictionary defines "duration" as "1: the quality or state of lasting for a period of time . . . 2: a portion of time which is measurable or during which something exists, lasts, or is in progress . . . ." Webster's Third New International Dictionary (1961) p. 703. Similarly, Black's Law Dictionary defines duration as "the length of time something lasts." Black's Law Dictionary (9th Ed. 2009) p. 578. Each of these definitions indicates that "duration" refers to an amount of time that is capable of being measured.

We recognize that the provision at issue here is written in such a way that the amount of time for which the listing agreements would be in effect is capable of being measured in some sense because it specifies a ten year period that begins to run from the time of the first conveyance or lease of a unit. The problem, however, is that when the listing agreements were executed, it was entirely unclear how far into the future the parties would be bound by the provision. That is because no party, at the time the agreements were consummated, knew if or when "the first conveyance of an individual unit or executed lease" would occur with respect to parcel 13 or parcel 15. In other words, the amount of time for which the parties were bound by the agreements was indeterminate because it could be calculated only by reference to an uncertain future event. Moreover, the problem is compounded by the fact that the provision also does not provide a ceiling on the ultimate amount of time the listing agreements could last. Accordingly, as written, the parties could be bound by the provision indefinitely.

What has transpired with respect to parcel 15 is illustrative of the indefinite nature of the duration provision at issue. Namely, according to the representations of the parties, as of the date of oral argument to this court (i.e., December 2, 2020), the term of the contract as to parcel 15 had not begun, nor had development of the office space started. It has been more than seventeen years since the listing agreements were executed, yet the parties still cannot say with any degree of certainty when the term will begin or end. Under these circumstances, we cannot conclude that the listing agreements strictly complied with the plain meaning of the duration requirement of § 20-325a (b) and/or (c) (2).

In light of our conclusion that the term "duration," as used in § 20-325a, is not ambiguous, it is unnecessary to look to extratextual sources. We note, however, that practically speaking our conclusion that listing agreements with an indefinite duration do not comply with § 20-325a is consistent with public policy and custom within the commercial real estate industry. See 2A N.

Singer & J. Singer, Sutherland Statutory Construction (7th Ed. 2007) § 45:2, p. 15 ("It is only through custom, usage, and convention that language acquires established meanings.") Specifically, with regard to exclusive right to sell–listing agreements in particular, a definite and measurable duration term is integral because during that time, so long as the broker uses best efforts to procure a buyer, the broker is entitled to a commission if the property sells, regardless of whether he or she is the one to actually procure the buyer. See *Real Estate Listing Service, Inc.* v. *Connecticut Real Estate Commission*, supra, 179 Conn. 133–34. In other words, for the duration of the contract, the broker is entitled to a commission even if the owner sells the property himself or herself.

Because these types of agreements implicate a property owner's right to alienate freely his or her own property and are highly favorable to the brokers named in the agreement, in that they allow the brokers potentially to reap the fruit of another person's labor, it is critical that the precise duration of such agreements is specifically delineated. See id., 133 ("[u]nder [the exclusive right to sell listing], the property owner relinquishes to some extent the right, although not the power, to alienate his real property" (footnote omitted)); see also *Harris* v. *McPherson*, 97 Conn. 164, 167–68, 115 A. 723 (1922) ("The owner, in a contract giving a broker the exclusive sale of property, makes the broker the only medium through which a purchaser can be procured during the life of the contract. The owner agrees, in such a contract, not only to exclude another agent, but also himself from procuring a purchaser. Ordinarily in this class of contracts, the exclusive sale is given to the broker *for a definite time*." (Emphasis added.)); 23 R. Lord, Williston on Contracts (4th Ed. 2002) § 62:20, p. 393 ("[a]n exclusive right to sell may be created only by clear and unambiguous language since the owner of property should not lightly be held to have surrendered the right to sell [the owner's] property unless that right is expressly negated by the contract").

Moreover, exclusive right to sell listing agreements of an indefinite duration do not tend to promote the legitimate interests of the parties involved or of the general public. As one California court of appeal observed in discussing that state's legislatively expressed public policy against open-ended exclusive real estate listing contracts: "[T]he evil which the legislature had in mind was the practice of some brokers to obtain contracts which placed themselves in a position to claim commissions for an indefinite time without performing any services, nor, perhaps ever intending to. . . . Besides being invariably disadvantageous to the property owner, open-ended exclusive listing contracts undoubtedly were seen as tending to promote disputes and lawsuits among parties affected and as generally being contrary to the legitimate interests of not only buyers and sellers

of real estate but brokers as well. For instance, as long as a listing of this kind had not been cancelled by mutual agreement, the property owner could not employ another broker except at the risk of having to pay double commissions." (Citation omitted; internal quotation marks omitted.) *Nystrom* v. *First National Bank of Fresno*, 81 Cal. App. 3d 759, 765–66, 146 Cal. Rptr. 711 (1978).

Furthermore, as to custom, the testimony of Scalzo, a licensed, experienced commercial real estate broker in Connecticut, who owns his own real estate franchise, indicates that it is considered best practices for a commercial real estate broker to set forth a measurable, definite duration for exclusive right to sell–listing agreements. Specifically, he testified that with regard to the "Exclusive Right to Sell–Listing Agreement" document that was used for the Woodland agreement and then photocopied and altered to serve as two of the documents comprising the listing agreements[29]: "I wouldn't know if it is [a legal and proper agreement] or not. I only use the [Connecticut Association Realtor (CAR)] forms because they teach us it has to have certain font. It's got to have a beginning date, end date." At another point during his testimony, Scalzo explained that it is his company's policy to use CAR forms "because we go to real estate class, and they tell us that we have to have the right font, we have to have a beginning date, end date and all those items that a realtor would have. And so our policy is that we use forms that we know will stand up." Moreover, upon review of the CAR form for an exclusive right to sell–listing agreement, it is clear that the form prompts the parties to specify a beginning date and ending date for the listing period.[30]

For these reasons, we conclude that the listing agreements here, which fail to set forth a measurable, definite duration, did not strictly comply with § 20-325a (b) and/or (c), and such failure is contrary to public policy and custom in the commercial real estate industry. This conclusion, however, does not end our analysis. We must still consider whether the plaintiffs are nevertheless entitled to recover commissions pursuant to subsection (d) of § 20-325a, which creates an exception to the requirements of subsections (b) and (c).

## II

Section 20-325a (d) provides in relevant part: "Nothing in . . . subdivisions (2) to (7), inclusive, of subsection (b) of this section or subsection (c) of this section shall prevent any licensee from recovering any commission . . . *if it would be inequitable to deny such recovery and the licensee* . . . with respect to a commercial real estate transaction, *has substantially complied* with subdivisions (2) to (6), inclusive, of subsection (b) of this section or subdivision (2) of subsection (c) of this section." (Emphasis added.) "Therefore, subsection (d) provides that, when . . . there is no strict compliance with the requirements of subsections (a), (b) and (c),

an action for a real estate commission under § 20-325a nonetheless may proceed if two preconditions are met: (1) there has been substantial compliance with the requirements relevant to the transaction; *and* (2) the facts and circumstances of a case would make it inequitable to deny recovery." (Emphasis added.) *Location Realty, Inc.* v. *Colaccino*, supra, 287 Conn. 719. "The use of the conjunctive 'and' in § 20-325a (d) indicates that, even if denial of recovery would be inequitable, a licensed broker may not recover a commission in a commercial real estate transaction if there is not substantial compliance with the specific requirements under subsections (b) or (c)." Id., 719 n.11.

First, we address whether the listing agreements here substantially complied with the requirements of § 20-325 (b) and/or (c). As previously mentioned, "[w]hether a particular listing agreement complies with § 20-325a . . . is a question of law." (Internal quotation marks omitted.) *NRT New England, LLC* v. *Jones*, supra, 162 Conn. App. 846. "The doctrine of substantial compliance is closely intertwined with the doctrine of substantial performance. . . . Pursuant to the doctrine of substantial performance, a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial." (Citation omitted; internal quotation marks omitted.) *Pack 2000, Inc.* v. *Cushman*, 311 Conn. 662, 675, 89 A.3d 869 (2014). "[S]ubstantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered . . . ." (Internal quotation marks omitted.) *21st Century North America Ins. Co.* v. *Perez*, 177 Conn. App. 802, 815, 173 A.3d 64 (2017), cert. denied, 327 Conn. 995, 175 A.3d 1246 (2018).

In the present case, we conclude that the listing agreements did not substantially comply with § 20-325a (b) and/or (c) because they were indefinite as to a key element of the agreement, namely the duration. See id. ("the doctrine of substantial performance applies only where performance of a *nonessential* condition is lacking" (emphasis in original; internal quotation marks omitted)). As previously discussed, the duration of an exclusive right to sell–listing agreement goes to the root or essence of the agreement because, during that specified period, so long as the broker uses best efforts to procure a buyer, the broker is entitled to a commission if the property sells, regardless of whether he or she actually procured the buyer. See *Real Estate Listing Service, Inc.* v. *Connecticut Real Estate Commission*, supra, 179 Conn. 133–34.

Failing to specify the duration of a listing agreement when that term is imperative to the parties' understand-

ing of their respective rights under the contract is a shortcoming of much greater magnitude than the type that this court previously has concluded constituted substantial compliance with § 20-325a (d). See *NRT New England, LLC* v. *Jones*, supra, 162 Conn. App. 851–52 (holding that parties' agreement substantially complied with § 20-325a (b) notwithstanding reference to wrong subsection of statute, which court characterized as "essentially a scrivener's error"); see also *Sunset Gold Realty, LLC* v. *Premier Building & Development, Inc.*, 133 Conn. App. 445, 454–56, 36 A.3d 243 (holding that there was substantial compliance with § 20-325a notwithstanding that assignee of original party to listing agreement, which specified that it was "binding upon . . . assigns," was not signatory to agreement because assignee sent e-mail explicitly acknowledging its duty to compensate broker (emphasis omitted)), cert. denied, 304 Conn. 912, 40 A.3d 319 (2012). Therefore, we conclude that the listing agreements did not substantially comply with § 20-325a.

Even if we were to conclude that the listing agreements did substantially comply with § 20-325a (b) and/or (c), subsection (d) also requires, as a precondition to the application of the exception, that the facts and circumstances are such that it would be inequitable to deny recovery. See *NRT New England, LLC* v. *Jones*, supra, 162 Conn. App. 849. In the present case, the trial court found that equity did not require that the plaintiffs be granted commissions under the circumstances presented. We review the trial court's equitable determination under the clearly erroneous standard. See id., 852 ("[t]he determination of whether a particular set of circumstances was unjust is essentially a factual finding for the trial court" (internal quotation marks omitted)). In doing so, we are mindful that "[t]he credibility of the witnesses and the weight to be accorded to their testimony is for the trier of fact. . . . [An appellate] court does not try issues of fact or pass upon the credibility of witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings." (Citation omitted; internal quotation marks omitted.) *Gaughan* v. *Higgins*, 186 Conn. App. 618, 626, 200 A.3d 1161 (2018), cert. denied, 330 Conn. 968, 200 A.3d 188 (2019), and cert. denied, 330 Conn. 968, 200 A.3d 699 (2019).

The plaintiffs argue that the court improperly found that equitable considerations do not entitle them to recovery. Specifically, the plaintiffs contend that they worked hard to market the parcels over several years before Jeanette Haddad's death and that the defendants

wrongfully prevented them from marketing the Abbey Woods units. We disagree with the plaintiffs that the court improperly concluded that equity does not entitle them to recovery.

There is evidence in the record to support the court's determination that it would not be inequitable to deny the plaintiffs relief; therefore, the finding was not clearly erroneous. Specifically, there was no sale or lease with regard to either parcel until March, 2013. Because exclusive right to sell/lease–listing agreements are inherently results driven, in that a commission is only due if a sale or lease is accomplished, it is not inequitable to deny recovery in an instance where a result was not achieved until nearly ten years after the listing contract was executed, and approximately two months after one of the named brokers had died.

In addition, as the court noted in its findings, after the fall of 2007, the real estate market conditions "[softened] to the point where the parties no longer felt that monthly, or even quarterly, in person meetings were necessary. In the words of Paul Kuehner, 'things went quiet,' and there were very few, if any, communications between the parties [after 2007]." Moreover, with regard to the efforts made by the brokers to procure buyers or tenants for the subject parcels, the court found that (1) "[f]rom early 2006 through the fall of 2007, [Garland Warren, Theodore Haddad, Sr., and Theodore Haddad, Jr., on behalf of Jeanette Haddad and Scalzo] diligently contacted possible buyers and lessees of the site in discharge of the broker's duties pursuant to the listing agreements" and (2) "[f]rom early to mid-2007, Jeanette Haddad and Scalzo continued to make best efforts to find prospective buyers or lessees . . . ."

These findings support the contention that the plaintiffs' diligent effort with regard to marketing parcels 13 and 15 only lasted for approximately two years. After the fall of 2007, the brokers were not expending much time or energy on this project,[31] they did not prepare any prospect lists,[32] and they did not spend any money advertising for parcel 15 or the Abbey Woods apartment complex on parcel 13. See 23 Williston on Contracts (4th Ed. 2021) § 62:20 ("[b]est efforts with which a broker is required to perform in order to collect a commission under an exclusive selling agreement include evidence of expenditure of time, effort, or money"). Although we acknowledge that the economic downturn undoubtedly contributed to the plaintiffs' reduced marketing activity, the evidence also supports the notion that, even under such circumstances, after 2007, the plaintiffs' effort left much to be desired.[33]

Furthermore, with regard to the plaintiffs' contention that the defendants wrongfully prevented them from performing their obligations under the listing agreements, the court made explicit findings to the contrary. Specifically, it found that (1) the defendants did not

take the property off the market, (2) if Jeanette Haddad or Scalzo found a valuable and qualified prospect, the defendants would have been happy to entertain it, and (3) the defendants waited for a prospective buyer to meet their demands, and in the meantime explored all available options. These findings are supported by the evidence and, thus, are not clearly erroneous.

We further acknowledge that, as the plaintiffs point out, the evidence is uncontroverted that the defendants did not notify the Haddads or Scalzo of the site plan approval for, or construction of, the Abbey Woods apartments. It is likewise uncontroverted, however, that after Theodore Haddad, Jr., learned of Abbey Woods in 2013, at which point it was already constructed, neither he, nor his father, made any effort to seek out potential tenants. They did not bring any potential tenants to the property, spend any time or money marketing the property, or even reach out to the defendants to discuss acting as a broker for the apartment units. As such, even if it was improper for the defendants not to notify the Haddads or Scalzo of Abbey Woods, in light of all of the facts, we are not convinced that it is inequitable to deny the plaintiffs commissions with respect to these apartments because, once they became aware of the apartments, they made no effort to lease them. Moreover, the fact that Theodore Haddad, Jr., was "shocked" to learn of Abbey Woods in 2013, is indicative of the lack of attention that was being given to this property, a property that the brokers would have needed to use best efforts to lease or sell to be entitled to commissions in the first place. See *Real Estate Listing Service, Inc.* v. *Connecticut Real Estate Commission*, supra, 179 Conn. 133–34 (under exclusive right to sell listing, "the broker incurs an obligation to use his best efforts during the contract period to procure a buyer").

Because the listing contract did not strictly or substantially comply with § 20-325a (b) and/or (c), and the trial court's finding that it would not be inequitable to deny the plaintiffs' recovery is not clearly erroneous, we affirm the judgment of the trial court in the breach of contract action. Moreover, in light of our conclusion that the plaintiffs cannot prevail in the breach of contract action, the plaintiffs' claims in the foreclosure actions also must fail. See footnote 1 of this opinion. Therefore, we affirm the trial court's judgment in each of those actions as well.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] Docket No. AC 38167 arises from the underlying breach of contract action. Docket Nos. AC 38440 and AC 38442 pertain to two actions that the plaintiffs commenced seeking to foreclose liens that they had recorded on the parcels of property that are the subject of the breach of contract action (foreclosure actions). See footnote 18 of this opinion. The plaintiffs' claims on appeal in the foreclosure actions are identical to the claims the plaintiffs make in the breach of contract action. As such, we conclude, consistent with the per curiam opinions previously issued by this court in those appeals, that the disposition of the claims in the foreclosure actions is controlled

by the disposition of the claims in the breach of contract action. See *Reserve Realty, LLC* v. *BLT Reserve, LLC*, 174 Conn. App. 150, 165 A.3d 159 (2017), rev'd on other grounds, 335 Conn. 174, 229 A.3d 708 (2020); *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 174 Conn. App. 153, 165 A.3d 160 (2017), rev'd on other grounds, 335 Conn. 174, 229 A.3d 708 (2020). Accordingly, because we conclude that the plaintiffs are not entitled to commissions in the breach of contract action, the plaintiffs' claims in the foreclosure actions also fail. See footnote 18 of this opinion.

[2] The plaintiffs initially raised three claims on appeal. Specifically, they claimed that the trial court improperly determined that (1) the purchase and sale agreements on which they based their claims for commissions constituted part of an illegal tying arrangement, (2) the listing agreements entered into pursuant to such purchase and sale agreements are unenforceable because they did not comply with § 20-325a, and (3) such listing agreements were unenforceable by the plaintiffs because they were personal service contracts of Jeanette Haddad. This court initially affirmed the judgment of the trial court on the ground that the purchase and sale agreements constituted part of an illegal tying arrangement under applicable antitrust law and did not address the plaintiffs' remaining two claims. See *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 174 Conn. App. 130, 141, 165 A.3d 162 (2017), rev'd, 335 Conn. 174, 229 A.3d 708 (2020). Our Supreme Court reversed the decision of this court, however, and remanded the case to us with direction to consider the plaintiffs' remaining claims. *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 335 Conn. 174, 204, 211, 229 A.3d 708 (2020). Because we now affirm the trial court's decision with respect to the plaintiff's second claim, we do not address the sole remaining claim.

[3] "To the extent that 'Jeanette Haddad, Broker' is distinct from Jeanette Haddad, those distinctions are not material to our resolution of the claims on appeal." *Reserve Realty I*, supra, 174 Conn. App. 132 n.1.

[4] "When formed, Reserve Realty was named UC Properties, LLC (UC Properties). On July 22, 2004, Scalzo filed articles of amendment, changing the name of the company from UC Properties to Reserve Realty." *Reserve Realty I*, supra, 174 Conn. App. 133 n.2. The trial court found that the limited liability company was formed "to market and sell portions of the Reserve property as it became subdivided and sold to various new owners."

[5] "The Kuehner and Haddad families have been personal friends and business associates since the late 1970s." *Reserve Realty I*, supra, 174 Conn. App. 133 n.3.

[6] "The plaintiffs moved to add Scalzo Realty as a necessary party to the action. The trial court granted the motion . . . . Thereafter, Scalzo Realty was defaulted for failure to plead. Subsequently, the plaintiffs withdrew this action as to Scalzo Realty." *Reserve Realty I*, supra, 174 Conn. App. 133 n.4.

[7] "Theodore Haddad, Jr., acted on behalf of Jeanette Haddad." *Reserve Realty I*, supra, 174 Conn. App. 135 n.7.

[8] "The trial court determined that it was not clear precisely how the final, fully executed hard copies of the agreements came to be executed by Jeanette Haddad. . . . The trial court found, however, that Carl Kuehner, Jr., executed the agreements on behalf of both BLT and Windemere with the intent that the defendants be legally bound." *Reserve Realty I*, supra, 174 Conn. App. 135 n.8.

[9] "In the buyer's agreement, the defendants appointed Scalzo Realty, UC Properties [LLC], and Jeanette Haddad as their exclusive agents to assist in the purchase of parcel 13 and parcel 15." *Reserve Realty I*, supra, 174 Conn. App. 135 n.9. UC Properties, LLC, which later became Reserve Realty, was not formed until five days after this agreement was executed (i.e., September 15, 2003).

[10] "The consent agreements did not address the defendants' obligation to use the plaintiffs' brokerage services." *Reserve Realty I*, supra, 174 Conn. App. 135 n.10.

[11] "In the exclusive right to sell–listing agreement for parcel 13, BLT granted Jeanette Haddad and Scalzo Realty the exclusive right to sell and/or lease parcel 13." *Reserve Realty I*, supra, 174 Conn. App. 136 n.11.

[12] "In the exclusive right to sell/lease–listing agreement for parcel 13, BLT granted UC Properties [LLC], Scalzo Realty, and Jeanette Haddad the exclusive right to sell and/or lease parcel 13 or any portion of parcel 13." *Reserve Realty I*, supra, 174 Conn. App. 136 n.12.

[13] "In the exclusive right to sell/lease–listing agreement for parcel 15, Windemere granted UC Properties [LLC], Scalzo Realty, and Jeanette Haddad the exclusive right to sell and/or lease parcel 15 or any portion of parcel 15." *Reserve Realty I*, supra, 174 Conn. App. 136 n.13.

[14] "In the exclusive right to sell–listing agreement for parcel 15, Windemere granted Jeanette Haddad and Scalzo Realty the exclusive right to sell and/or lease parcel 15." *Reserve Realty I*, supra, 174 Conn. App. 136 n.14.

[15] The trial court, in its memorandum of decision, refers to all of the agreements executed on September 10, 2003, as "the listing agreements."

[16] We refer to Jeanette Haddad, Theodore Haddad, Sr., and Theodore Haddad Jr., collectively as the Haddads and individually where appropriate.

[17] The plaintiffs filed two separate complaints, one with respect to parcel 13 and the other with respect to parcel 15. In both complaints, the plaintiffs alleged that the parties intended that the buyer's agreement and the listing agreements executed on September 10, 2003, "should be read together as a whole and to confirm the brokers' rights to commissions from" the defendants. The plaintiffs further alleged that those agreements "taken either separately or together complied with the provisions of [§] 20-325a of the Connecticut General Statutes . . . ."

[18] "Subsequently, on May 6, 2014, the plaintiffs commenced two actions seeking to foreclose liens that they had recorded as to parcel 13 and parcel 15 (foreclosure actions). On September 28, 2015, the parties filed a stipulation in each of the foreclosure actions, stipulating that the memorandum of decision in the [breach of contract] action required the conclusion that the plaintiffs could not establish probable cause to sustain the validity of the liens, as required by General Statutes § 20-325e. The parties, therefore, stipulated that judgment be rendered against the plaintiffs in the foreclosure actions, but that all appellate rights be reserved. The plaintiffs . . . appealed from the judgments ordering the discharge of the liens." *Reserve Realty I*, supra, 174 Conn. App. 137 n.15. This court, in separate per curiam opinions, affirmed the judgments in the foreclosure actions, stating that the disposition of the claims therein was governed by the disposition of the claims in the breach of contract action. See *Reserve Realty, LLC* v. *BLT Reserve, LLC*, 174 Conn. App. 150, 165 A.3d 159 (2017), rev'd on other grounds, 335 Conn. 174, 229 A.3d 708 (2020); *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 174 Conn. App. 153, 165 A.3d 160 (2017), rev'd on other grounds, 335 Conn. 174, 229 A.3d 708 (2020).

[19] The plaintiffs do not challenge on appeal the trial court's determination that all of the agreements executed on September 10, 2003, were intended to be read and interpreted together. As previously mentioned, the plaintiffs alleged in their complaint and argued to the trial court that the buyer's agreement and listing agreements should be read together as a whole, as that was the parties' intent. See footnote 17 of this opinion. In support thereof, the plaintiffs point to the fact that the agreements expressly reference one another. Specifically, the buyer's agreement states: "Buyer agrees to enter into a listing agreement dated 9/10/03 with Broker—Jeanette Haddad Broker, [Scalzo Realty], UC Properties, LLC." See *McCutcheon & Burr, Inc.* v. *Berman*, 218 Conn. 512, 523–24, 590 A.2d 438 (1991) ("[S]eparate documents will be deemed to constitute a valid contract under § 20-325a (b) if they collectively satisfy the statutory requirements *and relate to the same agreement*. . . . The burden of establishing a valid listing agreement in this manner is great, however, and must consist of more than a reference to the [listing] contract in the sales agreement. . . . Parole evidence will be considered if it convincingly shows that the signed and unsigned writings are connected to one another and have been assented to by the parties." (Citations omitted; emphasis in original; internal quotation marks omitted.)). Because the parties do not challenge the trial court's determination that the agreements should be read together, we do not review the propriety of that conclusion.

[20] The court reasoned: "In support of the defendants' argument that the agreements expire by their terms on September 10, 2010, the court accepts the plaintiffs' argument that the parties intended that the term of the agreements had to be at least several years in duration because of the size of the project, the potential for delays, and the possibility of upswings and downturns in real estate markets overall. A term of seven years is consistent with this argument. Secondly, September 10, 2010, has the virtue of being a definite date (plaintiff's [exhibit] 6). The court does not accept the plaintiffs' argument that the deadline of plaintiffs' [exhibit] 6 [buyer's agreement] refers only to the time within which the defendants were required to execute plaintiffs' exhibits 7, 8, 9 & 10 [the listing agreements]. The court rejects this reading because paragraph 4 of [the buyer's agreement] expressly requires the other agreements [listing agreements] to be signed on September 10, 2003, and because a period of seven years within which simply to sign the other agreements seems excessive and unlikely to have been the parties' intent.

"On the other hand, if one reads only [the listing agreements], and excludes [the buyer's agreement], the listing agreements could conceivably last for

an indefinite period of time. This reading of the agreement is equally unavailing to the plaintiffs, because listing agreements that continue for an indefinite period of time are inherently unreasonable and unenforceable. In other words, the agreements either expire by their express terms on September 10, 2010, or the agreements have no fixed expiration date and are, therefore, invalid for failure to comply with § 20-325a. Ambiguities in written agreements are construed against the drafting party. . . . In the present case, the court construes these ambiguities against the plaintiffs, who had primary responsibility for drafting the agreements and, arguably, superior knowledge of the law relating to listing agreements. Jeanette Haddad and Scalzo could have inserted a definite expiration date in the agreements; they did not, however, and the listing agreements are unenforceable for their failure to comply with the requirements of § 20-325a." (Citations omitted; footnote omitted.)

[21] Garland Warren, as an employee of Scalzo, worked with Theodore Haddad, Sr., and Theodore Haddad, Jr., to compile a list of possible buyers and/or lessees for the parcels, to create marketing materials to promote interest in the parcels, and, between early 2006 and the fall of 2007, to contact possible buyers and lessees.

[22] Pursuant to General Statutes § 20-311 (9), " '[c]ommercial real estate transaction' " is defined as "any transaction involving the sale, exchange, lease or sublease of real property other than real property containing any building or structure occupied or intended to be occupied by no more than four families or a single building lot to be used for family or household purposes." The transactions at issue here are properly characterized as commercial real estate transactions because there is no evidence to suggest that parcel 13 and/or parcel 15 were ever intended to be occupied by fewer than four families, or to contain a single building lot to be used for family or household purposes. Specifically, the master plan, which was approved by the Danbury Zoning Commission in November, 2002, before the defendants began negotiating with Woodland to purchase parcel 13 and parcel 15, provided that 470 residential rental units were to be built on parcel 13 and up to 650,000 square feet of office space was to be built on parcel 15. In fact, parcel 13 now contains a luxury apartment complex with 470 units, and parcel 15, which was still not developed as of the date of oral argument to this court, is still intended to be commercial office space. See *Reserve Realty I*, supra, 174 Conn. App. 149.

[23] For simplicity, we will refer to this type of contract as an "exclusive right to sell listing agreement." We recognize, however, that the agreements at issue are "exclusive right to sell/*lease* listing agreement[s]." (Emphasis added.) The fact that the listing agreements gave the brokers the exclusive right to procure tenants, as well as buyers, does not impact the analysis in any way.

[24] Neither party contends that these agreements are not exclusive right to sell–listing agreements. In addition, we note that the listing agreements (1) are clearly labeled "Exclusive Right to Sell–Listing Agreement" and "Exclusive Right to Sell/Lease–Listing Agreement," (2) the court refers to them as "exclusive" on numerous occasions in its findings of fact, (3) there is no determination by the court that, despite the label, the agreements truly are one of the other two types of listing agreements, and (4) the substance of the agreements is characteristic of exclusive right to sell–listing agreements. Specifically, they state: "Developer hereby grants to Broker the Exclusive Right to Sell and/or Lease the Property. Developer shall not on its' own or in conjunction with others sell and/or lease the Property without written approval from Broker, nor shall it grant any such rights to anyone else during the term of this Agreement." By contrast, it is characteristic of an open listing to permit the property owner to obtain the services of other real estate brokers to effect the sale of the property. See *Real Estate Listing Service, Inc.* v. *Connecticut Real Estate Commission*, supra, 179 Conn. 134. There is also no provision in the agreements at issue specifically stating that to be entitled to commissions the brokers had to procure a ready, willing and able buyer. See id., 132, 133 (under exclusive right to sell listing, "the sale of the property during the contract period, no matter by whom negotiated, obligates the property owner to pay a commission to the listing broker," whereas under open listing, "the property owner promises to pay the listing broker his commission when he produces a ready, willing and able buyer").

To the extent that the trial court seemingly analyzed the agreements here as if they were open listing agreements, essentially stating that broker's commissions would be due and payable to Jeanette Haddad and Scalzo

pursuant to the listing agreements only "*if Jeanette and/or Scalzo procured ready, willing, and able buyers* or lessees for parcel 13 or parcel 15," and then citing to a case that involved an open listing agreement; *New England Retail Properties, Inc.* v. *Maturo*, 102 Conn. App. 476, 925 A.2d 1151, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007); such analysis was improper. (Emphasis added.) Despite the trial court's purported error in this regard, our ultimate conclusion that the court's judgment should be affirmed does not change.

[25] There is no evidence in the record that rebuts the presumption of definitiveness of the language of the agreements at issue. None of the individuals who testified at trial indicated that they perceived any conflict between the buyer's agreement and the listing agreements when executed. Moreover, to the extent that the trial court reasoned that it was sensible to conclude that the parties intended that all of the agreements between them expire on September 10, 2010, because the agreements "had to be at least several years in duration because of the size of the project, the potential for delays, and the possibility of upswings and downturns in real estate markets overall," that same reasoning likewise supports the conclusion that the parties intended for the duration to be for a period of ten years from the date of the first conveyance of an individual unit or executed lease to a party unrelated to the defendants.

[26] We note that, even if we were to conclude that the duration provisions in the buyer's agreement and the listing agreements are conflicting and thus create ambiguity with regard to the parties' intent, our ultimate conclusion that the plaintiffs cannot prevail on their claim for commissions would be the same. See 11 R. Lord, Williston on Contracts (4th Ed. 1999) § 30:4, p. 46 ("[a]mbiguity may exist when two contractual provisions are in conflict with each other"). Specifically, assuming arguendo that we determined that the parties intended for all of the agreements to expire on September 10, 2010, the legal import of such conclusion would be that the parties' agreements complied with the duration requirement of § 20-325a, and were thus legally enforceable. Nevertheless, because the agreements are exclusive right to sell listing agreements and no sale or lease occurred with regard to parcel 13 or parcel 15 before the expiration date, the plaintiffs would not be entitled to a commission. See *Colliers, Dow & Condon, Inc.* v. *Schwartz*, 77 Conn. App. 462, 473–74, 823 A.2d 438 (2003) ("By its terms, the listing agreement was to provide the plaintiff with the exclusive right to offer the property for sale or lease. Under such an agreement, the sale or lease of the property *during the contract period*, no matter by whom negotiated, obligates the property owner to pay a commission to the listing broker." (Emphasis added.)).

[27] Specifically, § 20-328-6a (a) (1) of the Regulations of Connecticut State Agencies provides that it is applicable to situations "*other than a commercial real estate transaction*." (Emphasis added.)

[28] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[29] Theodore Haddad, Jr., testified that he brought the photocopies to the September 10, 2003 meeting and that Paul Kuehner made handwritten changes to the documents, including, inter alia, crossing out the first paragraph that stated: "AGEEMENT, made this 4th day of February, 2002 between Jeanette Haddad, Broker and [Scalzo Realty] . . . and Anthony O. Lucera and Glenn Tatangelo, their heirs and assigns . . . ."

[30] We also note that prior to the enactment of § 20-325a, our Supreme Court stated, when interpreting an exclusive right to sell–listing agreement that contained no provision as to its duration, "[w]here the agency is for the accomplishment of a particular transaction or specific purpose, the law implies its continuance for at least a reasonable time. . . . A reasonable time in this connection is in effect *a definite time*, to be fixed as a matter of fact by a court in case of controversy." (Citations omitted; emphasis added; internal quotation marks omitted.) *Harris* v. *McPherson*, supra, 97 Conn. 168. This suggests that, in this state, the notion that an exclusive right to sell agreement must be for a definite length of time has existed for nearly a century.

[31] At trial, Theodore Haddad, Jr., testified that, as of mid-2007, "[t]he prospect list that we developed came to a standstill. We couldn't add any new prospects to the list, we couldn't cultivate the existing prospects, noth-

ing—there was no activity, there was no expansion, no development, no relocation of any office users into the area because the economy was very soft." In addition, when asked, "And how long did the economy stay soft as far as you recall," he responded, "Some would say it still is." Furthermore, Theodore Haddad, Jr., testified that with regard to parcel 15, between 2007 and the date of his testimony (i.e., April 9, 2015), his mother, his father, and he all did "nothing" to seek office tenants for the property.

[32] On cross-examination, Theodore Haddad, Jr., stated that he created prospect lists for two months, and the last list he created was on April 20, 2007.

[33] Carl Kuehner testified, inter alia, that when the market changed in 2007, "the pool of buyers changed," and that, "[i]n a downward trending market . . . the apartment product actually becomes more valuable because that's where the consumer should theoretically go." In addition, he expressed his dissatisfaction with the brokers' performance after 2007, stating, "I had few, if any, meetings with any potential buyer that they brought forth to meet with me to discuss buying or building on that asset." Likewise, he stated, "[D]uring the best apartment market that we've seen in a decade, [the Haddads] weren't able to show up with a single buyer to—single's harsh— a single credible buyer to acquire that asset during the best apartment market we've seen in an awful long time." Furthermore, there is evidence that Paul Keuhner communicated to an individual working with the brokers named in the agreements that the brokers "can't expect to do nothing with the listing and get paid a commission."

————————————————